# EXHIBIT 1

## DECLARATION OF STACY HAUF

I, Stacy Hauf, declare and say as follows:

1. I am an Attorney Adviser in the Office of the Legal Adviser for the Department of State, Washington, DC. This office has responsibility for extradition requests, and I am charged with the extradition case of Dominic Jason Moore. I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. The relevant and applicable treaty provisions in full force and effect between the United States of America and the Federal Republic of Germany are found in the Treaty between the United States of America and the Federal Republic of Germany Concerning Extradition, signed on June 20, 1978 (the "1978 Treaty"), the Supplementary Treaty to the 1978 Treaty, signed on October 21, 1986 (the "1986 Supplementary Treaty"), and the Second Supplementary Treaty to the 1978 Treaty, signed on April 18, 2006 (the "2006 Second Supplementary Treaty") (collectively, the "Treaty"). A copy of the Treaty is attached to this declaration.

3. In accordance with the provisions of the Treaty, the Embassy of the Federal Republic of Germany has submitted Diplomatic Note number 56/2025, dated May 28, 2025, requesting the extradition of Dominic Jason Moore, as well as Diplomatic Note number 90/2025, dated July 18, 2025, supplementing this request. Copies of these diplomatic notes are attached to this declaration.

4. In accordance with Article 30 of the 1978 Treaty, the Government of the United States represent the interests of Germany in proceedings in U.S. courts arising out of extradition requests made by Germany, and Germany provides similar representation in its courts for extradition requests made by the United States.

5. The offenses for which extradition is sought are covered by Article 2 of the 1978 Treaty, as amended by Article 1 of the 1986 Supplementary Treaty.

6. Under Article 29 of the 1978 Treaty, as amended by Article 6 of the 2006 Second Supplementary Treaty, documents that bear the certificate or seal of the Ministry of Justice, or Ministry or Department responsible for foreign affairs, of the Requesting State are admissible in extradition

proceedings without further certification, authentication or other legalization. Therefore, such documents satisfy the authentication requirements for extradition without the need for certification by the U.S. Embassy in Berlin. Germany, in submitting documents in the instant case that bear the certificate or seal of the Ministry of Justice, has complied with the Treaty's provision on authentication.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed in Washington D.C. on July 31 ,2025.

_____
(STACY HAUF)

Attachments:

1. Copy of Notes
2. Copy of the Treaty

Botschaft
der Bundesrepublik Deutschland  MOORE - EXT request from Germany - 0003    1:25-mj-02312-JMC
Washington

L/LEI

2025 MAY 29  P II: 54

Please refer in reply: RK 531.41 SE Moore

DEPARTMENT OF STATE

### Note Verbale 56 / 2025

The Embassy of the Federal Republic of Germany presents its compliments to the US Department of State and, referring to Art. 29 of the Extradition Treaty between the Federal Republic of Germany and the United States of America of 1978 in the version of the Second Supplementary Agreement to the Extradition Treaty of 2006, has the honor to

forward the attached information by the public prosecution office in Kaiserslautern regarding the extradition of the US-citizen **Mr. Dominic Jason MOORE**, born on December 22nd 1995 in Virginia, **SSN: 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**, currently residing in 6810 Park Heights Avenue, Apartment 407, Baltimore, Maryland 21215, USA to be prosecuted for the crimes cited in the arrest warrant of the Regional Court in Kaiserslautern/Germany, case number 5 Qs 86/24 of August 20, 2024.

Germany intends to have the individual picked up by German officers in the US and to fly him to Germany at German government expense. For the handover of the individual, the US is asked to suggest an airport that provides a nonstop air service to Germany.

The personal data transmitted may be used solely for the purpose for which they were transmitted. The data may not be forwarded to other States or to international or supranational organizations without prior approval from the Government of the Federal Republic of Germany.

The evidence and information transmitted from Germany may be used for any investigative and trial purposes, including with regard to third persons, provided that it may not be introduced:

  a. in any trial for purposes of seeking to convict any person of an offence for which the death penalty could be imposed; and
  b. in proceedings before extraordinary courts;

absent prior consent from the Federal Republic of Germany.

- 2 -

A copy of this Note Verbale and copies of the relevant judicial documents are included for the US Department of Justice.

The Embassy of the Federal Republic of Germany avails itself of this opportunity to renew to the US Department of State the assurances of its highest consideration.

Washington, D.C., May 28, 2025



U.S. Department of State
Office of Law Enforcement
and Intelligence (L/LEI)
2201 C-Street, N.W.
Washington, D.C. 20520

Embassy
of the Federal Republic of Germany
Washington

MOORE - EXT request from Germany - 0005

1:25-mj-02312-JMC

Please refer in reply to: RK 531.41 SE Moore

LALEI

2025 JUL 22 · P  9 0₄

*Note Verbale 90/2023* DEPARTMENT OF STATE

The Embassy of the Federal Republic of Germany presents its compliments to the US Department of State and, referring to Art. 29 of the Extradition Treaty between the Federal Republic of Germany and the United States of America of 1978 in the version of the Second Supplementary Agreement to the Extradition Treaty of 2006, and its Note Verbale 56/2025 of May 28, 2025, has the honor to

forward enclosed additional documentation from the Public Prosecutor's Office in Kaiserslautern regarding the extradition of the U.S. citizen **Dominic Jason MOORE**, born on December 22, 1995 in Virginia, **SSN: 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**, currently residing at 6810 Park Heights Avenue, Apartment 407, Baltimore, Maryland 21215, to be prosecuted for the crimes cited in the arrest warrant of the Regional Court in Kaiserslautern/Germany, case number 5 Qs 86/24 dated August 20, 2024.

The personal data transmitted may be used solely for the purpose for which they were transmitted. The data may not be forwarded to other States or to international or supranational organizations without prior approval from the Government of the Federal Republic of Germany.

The evidence and information transmitted from Germany may be used for any investigative and trial purposes, including with regard to third persons, provided that it may not be introduced:

  a. in any trial for purposes of seeking to convict any person of an offence for which the death penalty could be imposed; and
  b. in proceedings before extraordinary courts;

absent prior consent from the Federal Republic of Germany.

- 2 -

A copy of this Note Verbale and copies of the relevant judicial documents are included for the US Department of Justice.

The Embassy of the Federal Republic of Germany avails itself of this opportunity to renew to the US Department of State the assurances of its highest consideration.

Washington, D.C., July 18, 2025



U.S. Department of State
Office of Law Enforcement
and Intelligence (L/LEI)
2201 C-Street, N.W.
Washington, D.C. 20520

MOORE - EXT request from Germany - 0007

**32 UST]**  *F.R.G.—Extradition—June 20, 1978*  **1487**

TREATY

between

The United States of America

and

the Federal Republic of Germany

Concerning Extradition

TIAS 9785

The United States of America

and

the Federal Republic of Germany -

desiring to provide for more effective cooperation between the two States in the repression of crime and, specifically, newly to regulate and thereby to facilitate the relations between the two States in the area of extradition -

have agreed as follows:

Article 1

Obligation to Extradite

(1) The Contracting Parties agree to extradite to each other subject to the provisions described in this Treaty persons found in the territory of one of the Contracting Parties who have been charged with an offense or are wanted by the other Contracting Party for the enforcement of a judicially pronounced penalty or detention order for an offense committed within the territory of the Requesting State.

(2) When the offense has been committed outside the territory of the Requesting State, the Requested State shall grant extradition subject to the provisions described in this Treaty if either

a) its laws would provide for the punishment of such an offense committed in similar circumstances, or

b) the person whose extradition is requested is
a national of the Requesting State.

### Article 2

#### Extraditable Offenses

(1) Extraditable offenses under this Treaty are:

a) Offenses described in the Appendix to this
Treaty which are punishable under the laws
of both Contracting Parties;

b) Offenses, whether listed in the Appendix to
this Treaty or not, provided they are punish-
able under the Federal laws of the United
States and the laws of the Federal Republic
of Germany.

In this connection it shall not matter whether or
not the laws of the Contracting Parties place the
offense within the same category of offenses or
denominate an offense by the same terminology.

(2) Extradition shall be granted in respect of an ex-
traditable offense:

a) For prosecution, if the offense is punishable
under the laws of both Contracting Parties by

MOORE - EXT request from Germany - 0010    1:25-mj-02312-JMC

**1490**    *U.S. Treaties and Other International Agreements*    [32 UST

deprivation of liberty for a maximum period
exceeding one year, or

b) For the enforcement of a penalty or a deten-
tion order, if the duration of the penalty
or detention order still to be served, or
when, in the aggregate, several such penalties
or detention orders still to be served, amount
to at least six months.

(3) Subject to the conditions set out in paragraphs
(1) and (2), extradition shall also be granted:

a) For attempts to commit, conspiracy to commit,
or participation in, an extraditable offense;

b) For any extraditable offense when, only for
the purpose of granting jurisdiction to the
United States Government, transportation,
transmission of persons or property, the
use of the mails or other means of communi-
cation or use of other means of carrying out
interstate or foreign commerce is also an
element of the specific offense.

(4) When extradition has been granted in respect of
an extraditable offense, it shall also be granted
in respect of any other extraditable offense which
would otherwise not be extraditable only by reason
of the operation of paragraph (2).

TIAS 9785

MOORE - EXT request from Germany - 0011   1:25-mj-02312-JMC

### Article 3

#### Territorial Application

(1) A reference in this Treaty to the territory of a
Contracting Party is a reference to all territory
under its jurisdiction.

(2) A reference in this Treaty to the territory of a
Contracting Party shall furthermore include its
territorial waters and airspace and vessels and
aircraft registered with the competent authority
of this Contracting Party if any such vessel is
on the high seas or if any such aircraft is in
flight when the offense is committed. For the
purpose of this Treaty an aircraft shall be con-
sidered to be in flight at any time from the moment
when all its external doors are closed following
embarkation until the moment when any such door is
opened for disembarkation.

### Article 4

#### Political Offenses

(1) Extradition shall not be granted if the offense in
respect of which it is requested is regarded by the
Requested State as a political offense, an offense
of a political character or as an offense connected
with such an offense.

TIAS 9785

MOORE - EXT request from Germany - 0012          1:25-mj-02312-JMC

(2) Extradition also shall not be granted if the Requested State has substantial grounds for believing that the request for extradition has, in fact, been made with a view to try or punish the person sought for an offense mentioned in paragraph (1).

(3) For the purpose of this Treaty the following offenses shall not be deemed to be offenses within the meaning of paragraph (1):

    a) A murder or other willful crime, punishable under the laws of both Contracting Parties by a penalty of at least one year, against the life or physical integrity of a Head of State or Head of Government of one of the Contracting Parties or of a member of his family, including attempts to commit such an offense, except in open combat;

    b) An offense which the Contracting Parties or the Requesting State have the obligation to prosecute by reason of a multi-lateral international agreement.

### Article 5

#### Military Offenses

Extradition shall not be granted if the offense in respect of which it is requested is purely a military offense.

TIAS 9785

### Article 6

#### Fiscal Offenses

If the competent executive authority of the Requested
State determines that an offense for which extradition
has been requested represents an offense as described
in Item No. 27 of the Appendix to this Treaty and that
extradition for such an offense would be contrary to
the public policy or other essential interests of that
State, extradition may be refused even though the offense
also falls into one of the other categories of extradit-
able offenses under this Treaty.

### Article 7

#### Extradition of Nationals

(1) Neither of the Contracting Parties shall be bound
to extradite its own nationals. The competent ex-
ecutive authority of the Requested State, however,
shall have the power to grant the extradition of
its own nationals if, in its discretion, this is
deemed proper to do and provided the law of the
Requested State does not so preclude.

(2) The Requested State shall undertake all available
legal measures to suspend naturalization proceedings
in respect of the person sought until a decision
on the request for his extradition and, if that re-
quest is granted, until his surrender.

(3) If the Requested State does not extradite its own
national, it shall, at the request of the Requesting
State, submit the case to its competent authorities
in order that proceedings may be taken if they are
considered appropriate. If the Requested State re-
quires additional documents or evidence, such docu-
ments or evidence shall be submitted without charge
to that State. The Requesting State shall be informed
of the result of its request.

### Article 8

#### Prior Jeopardy for Same Offense

Extradition shall not be granted when the person whose
extradition is requested has been tried and discharged
or punished with final and binding effect by the com-
petent authorities of the Requested State for the
offense for which his extradition is requested.

### Article 9

#### Lapse of Time

Extradition shall not be granted if at the time the Re-
quested State receives the request for extradition the
prosecution, or the enforcement of the penalty or of
the detention order, has become barred by lapse of time
under the law of the Requesting State.

TIAS 9785

MOORE - EXT request from Germany - 0015   1:25-mj-02312-JMC

## Article 10

### Jurisdiction of the Requested State

(1) Extradition may be refused if the person sought is proceeded against in the Requested State for the offense for which extradition is requested.

(2) The fact that the competent authorities of the Requested State have decided not to prosecute the person sought for the offense for which extradition is requested or decided to discontinue any criminal proceedings which have been initiated shall not preclude extradition.

## Article 11

### Complaint and Authorization

The obligation to extradite shall not be affected by the absence of any complaint or any authorization as a result of an offense if such complaint or such authorization is required under the law of the Requested State.

## Article 12

### Capital Punishment

When the offense for which extradition is requested is punishable by death under the laws of the Requesting State

MOORE - EXT request from Germany - 0016   1:25-mj-02312-JMC

1496      *U.S. Treaties and Other International Agreements*      [32 UST

and the laws of the Requested State do not permit such
punishment for that offense, extradition may be refused
unless the Requesting State furnishes such assurances as
the Requested State considers sufficient that the death
penalty shall not be imposed, or, if imposed, shall not
be executed.

### Article 13

#### Extraordinary Courts

(1) An extradited person shall not be tried by an
     extraordinary court in the territory of the Re-
     questing State.

(2) Extradition shall not be granted for the enforce-
     ment of a penalty imposed, or detention ordered,
     by an extraordinary court.

### Article 14

#### Channel of Communication; Extradition Documents

(1) The request for extradition, any subsequent docu-
     ments and all other communications shall be trans-
     mitted through the diplomatic channel unless otherwise
     provided by this Treaty.

(2) The request shall be accompanied by:

a) All available information concerning the
   identity and nationality of the person sought;

b) The text of all applicable provisions of law
   of the Requesting State concerning the definition
   of the offense, its punishment and the limitation
   of legal proceedings or the enforcement of penal-
   ties; and

c) A statement by a competent authority describing
   the measures taken, if any, that have interrupted
   the period of limitation under the law of the
   Requesting State.

(3) A request for the extradition of a person sought for
    the purpose of prosecution shall be accompanied, in
    addition to the documents provided for in paragraph
    (2), by:

a) A warrant of arrest issued by a judge of the
   Requesting State and such evidence as, according
   to the law of the Requested State, would justify
   his arrest and committal for trial if the offense
   had been committed there, including evidence
   proving that the person requested is the person
   to whom the warrant of arrest refers; and

b) A summary statement of the facts of the case
   unless they appear from the warrant of arrest.

(4) A request for the extradition of a person sought by
reason of a judgment of guilt for the imposition or
enforcement of a penalty or detention order shall be
accompanied, in addition to the documents provided
for in paragraph (2), by:

a) If the judgment handed down in the territory
of the Requesting State contains only a deter-
mination of guilt, this judgment, confirmation
that the judgment has final and binding effect
and a warrant of arrest issued by a competent
authority of the Requesting State;

b) If the judgment handed down in the territory
of the Requesting State contains the determin-
ation of guilt and the sentence imposed, a copy
of this judgment of conviction as well as the
confirmation that this judgment has final and
binding effect and is enforceable and a state-
ment of the portion of the sentence that has
not been served.

(5) A witness' statement taken down in writing or other
evidence, not under oath, shall be admitted in evi-
dence as a statement made or evidence given under
oath if it is certified that the person making the
statement or giving the evidence was warned by a
competent authority that any false, misleading or
incomplete declaration would render him liable to
punishment.

TIAS 9785

### Article 15

#### Additional Evidence

(1) If the Requested State considers that the evidence furnished in support of the request for the extradition of a person sought is not sufficient to fulfill the requirements of this Treaty, that State shall request the submission of necessary additional evidence; it may fix a time limit for the submission of such evidence and, upon the Requesting State's application, for which reasons shall be given, may grant a reasonable extension of the time limit.

(2) If the person sought is under arrest and the additional evidence or information submitted as aforesaid is not sufficient, or if such evidence or information is not received within the period specified by the Requested State, he shall be discharged from custody. However, such discharge shall not bar a subsequent request in respect of the same offense. In this connection it shall be sufficient if reference is made in the subsequent request to the supporting documents already submitted provided these documents will be available at the extradition proceedings on this subsequent request.

1500      *U.S. Treaties and Other International Agreements*      [32 UST

### Article 16

#### Provisional Arrest

(1) In case of urgency either Contracting Party may
apply for the provisional arrest of the person sought
before the request for extradition has been submitted
to the Requested State through the diplomatic channel.
The request for provisional arrest may be made either
through the diplomatic channel or directly between
the United States Department of Justice and the Minister
of Justice of the Federal Republic of Germany.

(2) The application for provisional arrest shall state
that a warrant of arrest as mentioned in paragraph
(3) a) of Article 14, or a judgment as mentioned in
paragraph (4) a) or b) of Article 14, exists and that
it is intended to make a request for extradition. It
shall also state the offense for which extradition will
be requested and when and where such offense was com-
mitted and shall give all available information con-
cerning the description of the person sought and his
nationality. The application shall also contain such
further information, if any, as would be necessary to
justify the issuance of a warrant of arrest in the
Requested State had the offense been committed, or
the person sought been convicted, in that State.

TIAS 9785

(3) On receipt of an application for provisional arrest
the Requested State shall take the necessary steps
to secure the arrest of the person sought.

(4) Provisional arrest shall be terminated if, within
a period of 40 days after the apprehension of the
person sought, the Requested State has not received
the request for extradition and the documents men-
tioned in Article 14. This period may be extended,
upon the Requesting State's application, for up to
an additional 20 days after the apprehension of the
person sought.

(5) The termination of provisional arrest pursuant to
paragraph (4) shall not prejudice the extradition of
the person sought if the extradition request and the
supporting documents mentioned in Article 14, insofar
as they were not submitted in a timely manner, are
later delivered. In this connection, reference may
be made to the extradition request and the supporting
documents which have already been transmitted to the
Requested State.

### Article 17

Requests for Extradition Made by Several States

(1) A Contracting Party which has received concurrently
requests for the extradition of the same person either
for the same offense, or for different offenses, from

the other Contracting Party and from a third State
shall make its decision having regard to all the cir-
cumstances and especially the possibility of a sub-
sequent re-extradition to another Requesting State,
the relative seriousness and place of commission of
the offenses, the nationality of the person sought
and the provisions of any extradition agreements
between the Requested State and the Requesting States.

(2) If the Requested State reaches a decision at the
same time upon extradition to one of the Requesting
States and on re-extradition to another Requesting
State, it shall communicate that decision on
re-extradition to each of the Requesting States.

### Article 18

#### Simplified Extradition

If the extradition of a person sought to the Requesting
State is not obviously precluded by the laws of the Re-
quested State and provided the person sought irrevocably
agrees in writing to his extradition after personally
being advised by a judge or competent magistrate of his
rights to formal extradition proceedings and the protection
afforded by them that he would lose, the Requested State
may grant his extradition without a formal extradition
proceeding having taken place. In this case Article 22(1)
shall not be applicable.

TIAS 9785

### Article 19

#### Decision

(1) The Requested State shall promptly communicate to the Requesting State the decision on the request for extradition.

(2) The Requested State shall give the reasons for any complete or partial rejection of the request for extradition.

### Article 20

#### Delayed Decision and Surrender

The Requested State may, after a decision on the request has been rendered by a competent court, defer the surrender of the person whose extradition is requested, when that person is being proceeded against or is serving a sentence in the territory of the Requested State for a different offense, until the conclusion of the proceedings and the full execution of any punishment he may be or may have been awarded. In this case the Requested State shall advise the Requesting State.

1504    *U.S. Treaties and Other International Agreements*    [32 UST

### Article 21

#### Surrender of the Person Sought

(1) If the extradition has been granted, surrender
of the person sought shall take place within such
time as may be prescribed by the laws of the Re-
quested State. If no time period for surrender is
prescribed by the laws of the Requested State,
surrender shall take place within 30 days from
the date on which the Requesting State has been
notified that the extradition has been granted.
The competent authorities of the Contracting
Parties shall agree on the time and place of the
surrender of the person sought.

(2) If the person sought is not removed from the terri-
tory of the Requested State within the time required
under paragraph (1), he may be set at liberty. The
Requested State may subsequently refuse to extradite
the person sought for the same offense.

(3) If circumstances beyond its control prevent a Con-
tracting Party from timely surrendering or taking
delivery of the person to be extradited, it shall
notify the other Contracting Party before the ex-
piration of the time limit. In such a case the
competent authorities of the Contracting Parties
may agree upon a new date for the surrender.

### Article 22

### Rule of Speciality

(1) A person who has been extradited under this Treaty shall not be proceeded against, sentenced or detained with a view to carrying out a sentence or detention order for any offense committed prior to his surrender other than that for which he was extradited, nor shall he be for any other reason restricted in his personal freedom, except in the following cases:

a) When the State which extradited him consents thereto. A request for consent shall be submitted, accompanied by the documents mentioned in Article 14 and a record established by a judge or competent officer of the statement made by the extradited person in respect of the request for consent. If under the law of the Requesting State the issuance of a warrant of arrest for the offense for which extradition is sought is not possible, the request may instead be accompanied by a statement issued by a judge or competent officer establishing that the person sought is strongly suspected of having committed the offense.

MOORE - EXT request from Germany - 0026    1:25-mj-02312-JMC

1506    *U.S. Treaties and Other International Agreements*    [32 UST

    b) When such person, having had the opportunity to leave the territory of the State to which he has been surrendered, has not done so within 45 days of his final discharge or has returned to that territory after leaving it. A discharge under parole or probation without an order restricting the freedom of movement of the extradited person shall be deemed equivalent to a final discharge.

(2) The State to which the person has been extradited may, however, take any legal measures necessary under its law, in order to proceed in absentia, to interrupt any lapse of time or to record a statement under paragraph (1) a).

(3) If the offense for which the person sought was extradited is legally altered in the course of proceedings, he shall be prosecuted or sentenced provided the offense under its new legal description is:

    a) Based on the same set of facts contained in the extradition request and its supporting documents; and

    b) Punishable by the same maximum penalty as, or a lesser maximum penalty than, the offense for which he was extradited.

## Article 23

### Re-extradition to a Third State

(1) Except as provided for in Article 22 (1) b), the Requesting State shall not, without the consent of the Requested State, re-extradite to a third State a person extradited to the Requesting State and sought by the said third State in respect of an offense committed prior to his surrender.

(2) A request for consent to re-extradition to a third State shall be accompanied by the documents supporting the request for extradition made by the third State, if the Requested State needs these documents for its decision. These documents shall conform to the documents mentioned in Article 14 of this Treaty.

## Article 24

### Information on the Result of the Criminal Proceedings

The Requesting State shall upon demand inform the Requested State of the result of the criminal proceedings against the extradited person and send a copy of the final and binding decision to that State.

MOORE - EXT request from Germany - 0028

1508    *U.S. Treaties and Other International Agreements*    [32 UST

### Article 25

#### Surrender of Property

(1) To the extent permitted under the laws of the
Requested State and subject to the rights of that
State or of third parties, which shall be duly re-
spected, all articles which may serve as evidence,
or which have been acquired as a result of an
offense, or have been obtained as consideration
for such articles, and which at the time of the
arrest are found in the possession of the person
sought or are discovered subsequently, shall be
surrendered if extradition of the person sought
is granted. Surrender of such articles shall be
possible even without any special request and,
if possible, at the same time that the person
sought is surrendered.

(2) Subject to the conditions provided in paragraph
(1), the articles mentioned therein shall be
surrendered even if the person sought cannot be
surrendered owing to his death or escape.

(3) The Requested State may condition the surrender
of articles upon a satisfactory assurance from
the Requesting State that the articles will be
returned to the Requested State as soon as possible.

### Article 26

#### Transit

(1) Transit of a person who is the subject of extra-
dition from a third State through the territory
of a Contracting Party to the territory of the
other Contracting Party shall be granted on sub-
mission of a request, provided that the offense
concerned is an extraditable offense under Article
2 and that the Contracting Party requested to
grant transit does not consider the offense to be
one covered by Articles 4 or 5.

(2) Transit of a national of the Requested State
may be refused if, in the opinion of that State,
it is inadmissible under its law.

(3) Subject to the provisions of paragraph (4), the
request for transit must be accompanied by a
warrant of arrest issued by a judge or competent
officer of the Requesting State and by a statement
as mentioned in Article 14 (3) b).

(4) If air transport is used, the following provisions
shall apply:

a) When no intermediate stop is foreseen, the Contracting Party requesting transit shall notify the other Contracting Party, certify that one of the documents mentioned in Article 14, paragraph (3) a) or paragraph (4) a) or b) exists, and state whether the person whose transit is being notified is a national of the Contracting Party over the territory of which the flight is to be made. In the case of an unscheduled landing such notification shall have the effect of a request for provisional arrest as provided for in Article 16; thereafter a formal request for transit shall be made.

b) When an intermediate stop is planned, the Contracting Party requesting transit shall submit a formal request for transit.

## Article 27

### Applicable Law

Except where this Treaty otherwise provides, the law of the Requested State shall be applicable with respect to provisional arrest, extradition and transit.

MOORE - EXT request from Germany - 0030

### Article 28

#### Language to be Used

The documents transmitted in the application of this Treaty shall be in the language of the Requesting State accompanied by a certified translation into the language of the Requested State. The expense of translation shall be borne by the Requesting State.

### Article 29

#### Certification

A warrant of arrest and depositions or other evidence, given on oath or in a manner described in Article 14 (5), and the judgment of conviction and of the sentence, if it has been passed, or certified copies of these documents, shall be admitted in evidence in the examination of the request for extradition when:

    a) In the case of a request emanating from the Federal Republic of Germany, they are signed by a judge or competent officer, are authenticated by the official seal of the Federal Minister of Justice and are certified by the competent diplomatic or consular officer of the United States in the Federal Republic of Germany, or

1512    *U.S. Treaties and Other International Agreements*    [32 UST

b) In the case of a request emanating from the
United States, they are signed by a judge
or competent officer, are authenticated by
the official seal of the Department of State
and are certified by the competent diplomatic
or consular officer of the Federal Republic
of Germany in the United States.

### Article 30

#### Expenses

Expenses arising from the transportation of a person
sought to the Requesting State shall be borne by that
State. No other pecuniary claim arising from an extra-
dition or a transit request shall be made by the Re-
quested State against the Requesting State. The
appropriate legal officers of the State in which the
extradition proceedings take place shall, by all legal
means within their power, assist the Requesting State
before the competent judges and officers.

### Article 31

#### Scope of Application

This Treaty shall apply to offenses encompassed by
Article 2 committed before as well as after the date
this Treaty enters into force. Extradition shall not
be granted, however, for an offense committed before
this Treaty enters into force which was not an offense
under the laws of both Contracting Parties at the time
of its commission.

TIAS 9785

MOORE - EXT request from Germany - 0033

### Article 32

#### Definitions

For the purpose of this Treaty, the term

a) "Penalty" means deprivation of liberty as a result of a sentence upon conviction for an offense;

b) "Detention order" means any order involving deprivation of liberty which has been made by a criminal court in addition to or instead of a penalty.

### Article 33

#### Berlin Clause

(1) This Treaty shall also apply to Land Berlin provided that the Government of the Federal Republic of Germany does not make a contrary declaration to the Government of the United States of America within three months of the date of entry into force of this Treaty.

(2) Upon the application of this Treaty to Land Berlin, references in the Treaty to the Federal Republic of Germany or to the territory thereof shall be deemed also to be references to Land Berlin.

1514    *U.S. Treaties and Other International Agreements*    [32 UST

### Article 34

Ratification; Coming Into Force; Denunciation

(1) This Treaty shall be subject to ratification; the instruments of ratification shall be exchanged in Washington, D.C., as soon as possible.

(2) This Treaty shall enter into force 30 days after the exchange of the instruments of ratification.[¹]

(3) Between the Contracting Parties this Treaty shall terminate and replace the Extradition Treaty between the United States of America and Germany signed at Berlin July 12, 1930.[²]

(4) This Treaty shall continue in force until the expiration of one year from the date on which written notice of termination is given by one Contracting Party to the other.

Done at Bonn this 20th day of June, 1978, in duplicate in the English and German languages, both texts being equally authentic.

For the
United States of America

For the
Federal Republic of Germany

_Traurer Stoessel_ [³]    _father m Lef_ [⁴]
                         _Guenther Erker_ [⁵]

¹ Aug. 29, 1980.
² TS 836; 47 Stat. 1862.
³ Walter J. Stoessel, Jr.
⁴ Guenther Van Well.
⁵ Guenther Erkel.

TIAS 9785

## APPENDIX

1. Murder.
2. Manslaughter.
3. Aggravated wounding, injury, or assault, even when loss of life results; wounding or injuring with intent to cause grievous bodily harm.
4. Illegal abortion.
5. Kidnapping; abduction; false imprisonment; child-stealing.
6. Rape, indecent assault; incest; bigamy.
7. Unlawful sexual acts with or upon children under the age specified by the laws both of the Requesting and Requested States.
8. Procuration.
9. Libel.
10. Willful non-support or willful abandonment of a minor or other dependent person when by reason of such non-support or abandonment the life of that minor or other dependent person is or is likely to be endangered.
11. Robbery; larceny; burglary; embezzlement; extortion.
12. Malicious damage to property.
13. Fraud, including offenses against the laws relating to the unlawful obtaining of money, property or securities, to fiduciary relationships or to exploitation of minors.

14. Offenses against the laws relating to forgery,
    including the making of forged documents or records,
    whether official or private, or the uttering or
    fraudulent use of such documents or records.

15. Receiving, possessing, or transporting for personal
    benefit any money, valuable securities, or other
    property, knowing the same to have been unlawfully
    obtained.

16. Offenses relating to counterfeiting.

17. Perjury, including subornation of perjury; false
    statements, either written or oral, whether or not
    under oath, made to a judicial authority or to a
    government agency or office.

18. Arson.

19. Unlawful obstruction of juridical proceedings or
    proceedings before governmental bodies or inter-
    ference with an investigation of a violation of a
    criminal statute, by influencing, bribing, impeding,
    threatening, or injuring by any means any officer
    of the court, juror, witness, or duly authorized
    criminal investigator.

20. a) Unlawful abuse of official authority which
       results in bodily injury or deprivation of
       life, liberty or property of any person.

    b) Unlawful injury or intimidation in connection
       with, or interference with, voting or candidacy
       for public office, jury service, government
       employment, or the receipt or enjoyment of
       benefits provided by government agencies.

TIAS 9785

21. Facilitating or permitting the escape of a person
    from custody; prison mutiny.

22. Offenses against the laws relating to bribery.

23. Offenses against the laws relating to civil disorders.

24. Offenses against the laws relating to illegal gambling
    enterprises.

25. Any act willfully jeopardising the safety of any
    person traveling upon a railway or in any aircraft
    or vessel or other means of transportation.

26. Piracy, by statute or by the law of nations; mutiny
    or revolt aboard an aircraft or vessel against the
    authority of the captain or commander of such air-
    craft or vessel; any seizure or exercise of control,
    by force or violence or threat of force or violence,
    of an aircraft or vessel.

27. a) Offenses against the laws relating to importa-
       tion, exportation or transit of goods, articles,
       or merchandise.

    b) Offenses relating to willful evasion of taxes
       and duties.

    c) Offenses against the laws relating to interna-
       tional transfers of funds.

28. Offenses against the bankruptcy laws.

29. Offenses against the laws relating to narcotic drugs,
    Cannabis sativa L., Hallucinogenic drugs, cocaine and
    its derivatives, and other dangerous drugs and chemicals.

30. Offenses against the laws relating to the illicit
    manufacture of or traffic in poisonous chemicals or
    substances injurious to health.

1518    *U.S. Treaties and Other International Agreements*    [32 UST

31. Offenses against the laws relating to firearms, ammunition, explosives, incendiary devices or nuclear materials.

32. Offenses against the laws relating to the sale or transportation or purchase of securities or commodities.

33. Any other act for which extradition may be granted in accordance with the laws of both Contracting Parties.

---

### PROTOCOL

At the time of signing this day of the Extradition
Treaty between the United States of America and the
Federal Republic of Germany the undersigned plenipoten-
tiaries have agreed that Article 4(3)(b) of the Treaty
and Item No. 20(b) of the Appendix thereto are to be
interpreted as follows:

(1) With respect to the interpretation of Article
    4(3)(b) the Contracting Parties mutually agree that
    at the time of the conclusion of the Treaty, this
    provision has reference, for example, to the Conven-
    tion for the Suppression of Unlawful Seizure of
    Aircraft of December 16, 1970,[1] the Convention for
    the Suppression of Unlawful Acts Against the Safety
    of Civil Aviation of September 23, 1971,[2] and the
    Convention on the Prevention and Punishment of
    Crimes Against Internationally Protected Persons
    including Diplomatic Agents of December 14, 1973.[3]

(2) The Contracting Parties mutually agree to interpret
    Item No. 20(b) of the Appendix to the Treaty as
    meaning that the terms "jury service" and "ehren-
    amtlicher Richter" apply to persons who in the
    legal practice of both Contracting Parties have
    corresponding functions (in the United States of
    America: members of a jury; in the Federal Republic
    of Germany: members of a court who are not judges by
    profession).

---

[1] TIAS 7192; 22 UST 1641.
[2] TIAS 7570; 24 UST 564.
[3] TIAS 8532; 28 UST 1975.

TIAS 9785

MOORE - EXT request from Germany - 0040          1:25-mj-02312-JMC

1520     *U.S. Treaties and Other International Agreements*     [32 UST

Done at Bonn this 20th day of June, 1978, in duplicate
in the English and German languages, both texts being
equally authentic.


For the                          For the
United States of America         Federal Republic of Germany


TIAS 9785

## SUPPLEMENTARY TREATY TO THE TREATY BETWEEN THE UNITED STATES OF AMERICA AND THE FEDERAL REPUBLIC OF GERMANY CONCERNING EXTRADITION

*The United States of America and the Federal Republic of Germany,*

*Desiring* to make more effective the Treaty of June 20, 1978 between the United States of America and the Federal Republic of Germany concerning Extradition (hereinafter referred to as "the Extradition Treaty"),

*Have agreed as follows:*

### ARTICLE 1

(a) Article 2, paragraph (1) of the Extradition Treaty is amended to read as follows:

"(1) Extraditable offenses under the Treaty are offenses which are punishable under the laws of both Contracting Parties. In determining what is an extraditable offense it shall not matter whether or not the laws of the Contracting Parties place the offense within the same category of offense or denominate an offense by the same terminology, or whether dual criminality follows from Federal, State or Laender laws. In particular, dual criminality may include offenses based upon participation in an association whose aims and activities include the commission of extraditable offenses, such as a criminal society under the laws of the Federal Republic of Germany or an association involved in racketeering or criminal enterprise under the laws of the United States."

(b) Article 6 of the Extradition Treaty is amended to read as follows:

"Extradition may be refused for offenses in connection with taxes, duties, customs and exchange if the competent executive authority of the Requested State determines that extradition for any such offense would be contrary to the public policy or other essential interests of the Requested State."

(c) The Appendix to the Extradition Treaty is hereby deleted.

### ARTICLE 2

Article 4, paragraph (3) of the Extradition Treaty is amended to read as follows:

"For the purpose of this Treaty the following offenses shall not be deemed to be offenses within the meaning of paragraph (1):

(a) an offense for which both Contracting Parties have the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit his case to their competent authorities for decision as to prosecution;

(b) murder, manslaughter, maliciously wounding, or inflicting grievous bodily harm;

(1)

MOORE - EXT request from Germany - 0042

2

(c) kidnapping, abduction, or any form of unlawful detention, including taking a hostage;

(d) placing or using an explosive, incendiary or destructive device capable of endangering life, or of causing grievous bodily harm, or of causing substantial property damage;

(e) an attempt or conspiracy to commit, or participation in, any of the foregoing offenses."

### ARTICLE 3

The title of Article 20 of the Extradition Treaty is amended to read as follows: "Temporary or Deferred Surrender." The text of Article 20 is renumbered to become Article 20, paragraph (1), and the following text is inserted as Article 20, paragraph (2):

"(2) Alternatively, the Requested State may temporarily surrender the person sought to the Requesting State for the purpose of prosecution. The person so surrendered shall be kept in custody in the Requesting State and shall be returned to the Requested State after conclusion of the proceedings against that person, in accordance with conditions to be determined by mutual agreement of the Contracting Parties."

### ARTICLE 4

This Supplementary Treaty shall apply to any offense committed, and to any request made, or to any person found extraditable, before or after this Supplementary Treaty enters into force, provided that this Supplementary Treaty shall not apply to an offense committed before this Supplementary Treaty enters into force which was not an offense under the laws of both Contracting Parties at the time of its commission.

### ARTICLE 5

(1) This Supplementary Treaty shall also apply to Land Berlin provided that the Government of the Federal Republic of Germany does not make a contrary declaration to the Government of the United States of America within three months of the date of entry into force of this Supplementary Treaty.

(2) Upon the application of this Supplementary Treaty to Land Berlin, references in the Supplementary Treaty to the Federal Republic of Germany or to the territory thereof shall be deemed also to be references to Land Berlin.

### ARTICLE 6

(1) This Supplementary Treaty shall form an integral part of the Extradition Treaty.

(2) This Supplementary Treaty shall be subject to ratification and the instruments of ratification shall be exchanged at Bonn as soon as possible. It shall enter into force upon the exchange of instruments of ratification. It shall be subject to termination in the same manner as the Extradition Treaty.

In witness whereof, the undersigned, being duly authorized thereto by their respective Governments, have signed this Supplementary Treaty.

MOORE - EXT request from Germany - 0043    1:25-mj-02312-JMC

3

Done at Washington this twenty-first day of October 1986, in duplicate, in the English and German languages, both texts being equally authentic.

FOR THE UNITED STATES
OF AMERICA:

FOR THE FEDERAL REPUBLIC
OF GERMANY:

o

MOORE - EXT request from Germany - 0044

Second Supplementary Treaty

to

the Treaty between the United States of America

and

the Federal Republic of Germany

Concerning Extradition

2

The Government of the United States of America

and

the Government of the Federal Republic of Germany,

As contemplated by Article 3, paragraph (2) of the Agreement on Extradition between the United States of America and the European Union signed 25 June 2003 (hereafter "the U.S.-EU Extradition Agreement"),

Acknowledging that in accordance with the provisions of this Second Supplementary Treaty, the bilateral Treaty between the United States of America and the Federal Republic of Germany Concerning Extradition signed 20 June 1978 as amended by the Supplementary Treaty to the Treaty between the United States of America and the Federal Republic of Germany Concerning Extradition signed 21 October 1986 (hereafter referred to as "the bilateral extradition treaty") is applied in the manner set forth in Article 3 of the U.S.-EU Extradition Agreement,

Have agreed as follows:

## Article 1

Pursuant to Article 13 of the U.S.- EU Extradition Agreement, Article 12 of the bilateral extradition treaty is amended to read as follows:

3

"Article 12

Capital Punishment

Where the offense for which extradition is sought is punishable by death under the laws in the Requesting State and not punishable by death under the laws in the Requested State, the Requested State may grant extradition on the condition that the death penalty shall not be imposed on the person sought, or if for procedural reasons such condition cannot be complied with by the Requesting State, on condition that the death penalty if imposed shall not be carried out. If the Requesting State accepts extradition subject to conditions pursuant to this Article, it shall comply with the conditions. If the Requesting State does not accept the conditions, the request for extradition may be denied."

Article 2

Pursuant to Article 14 of the U.S.- EU Extradition Agreement, the following text is inserted into the bilateral extradition treaty as Article 15 bis:

"Article 15 bis

Sensitive information in a request

Where the Requesting State contemplates the submission of particularly sensitive information in support of its request for extradition, it may consult the Requested State to determine the extent to which the information can be protected by the Requested State. If the Requested State cannot protect the information in the manner sought by the Requesting State, the Requesting State shall determine whether the information shall nonetheless be submitted."

Article 3

Pursuant to Article 6 of the U.S.-EU Extradition Agreement, the following text is added to the bilateral extradition treaty as the final sentence of Article 16, paragraph (1):

4

"The facilities of the International Criminal Police Organization (Interpol) may be used to transmit such a request."

### Article 4

Pursuant to Article 7 of the U.S.- EU Extradition Agreement, the following text is inserted into the bilateral extradition treaty as Article 16, paragraph (5):

"(5) The Requesting State may satisfy its obligation to transmit its request for extradition and supporting documents through the diplomatic channel pursuant to Article 14, paragraph (1), by submitting the request and documents to the Embassy of the Requested State located in the Requesting State. In that case, the date of receipt of such request by the Embassy shall be considered to be the date of receipt by the Requested State for purposes of applying the time limit that must be met under paragraph (4) of the present Article to enable the person's continued detention."

The current paragraph (5) is renumbered to become paragraph (6).

### Article 5

Pursuant to Article 10 of the U.S.- EU Extradition Agreement, Article 17 of the bilateral extradition treaty is amended to read as follows:

"Article 17
Requests for Extradition or Surrender Made by Several States

(1) If the Requested State receives requests from the Requesting State and from any other State or States for the extradition of the same person either for the same offense or for different offenses, or if the Federal Republic of Germany receives an extradition

5

request from the United States of America and a request for surrender pursuant to the European arrest warrant for the same person, either for the same offense or for different offenses, the competent authority of the executive branch of the Requested State shall determine to which State, if any, it will surrender the person.

(2) In making its decision under paragraph (1) of this Article, the Requested State shall consider all of the relevant factors, including, but not limited to, the following:

   a) whether the requests were made pursuant to a treaty;
   b) the places where each of the offenses was committed;
   c) the respective interests of the Requesting States;
   d) the seriousness of the offenses;
   e) the nationality of the victim;
   f) the nationality of the person sought;
   g) the possibility of any subsequent re-extradition between the Requesting States; and
   h) the chronological order in which the requests were received from the requesting States.

(3) If the Requested State reaches a decision at the same time upon extradition to one of the Requesting States and on re-extradition to another Requesting State, it shall communicate that decision on re-extradition to each of the Requesting States."

Article 6

Pursuant to Article 5, paragraph (2) of the U.S.- EU Extradition Agreement, Article 29 of the bilateral extradition treaty is amended to read as follows:

6

## "Article 29
### Certification

Documents that bear the certificate or seal of the Ministry of Justice, or Ministry or Department responsible for foreign affairs, of the Requesting State shall be admissible in extradition proceedings in the Requested State without further certification, authentication, or other legalization. "Ministry of Justice" shall, for the United States of America, mean the United States Department of Justice; and, for the Federal Republic of Germany, the Federal Ministry of Justice."

## Article 7

(1) In accordance with Article 16 of the U.S.-EU Extradition Agreement, this Supplementary Treaty shall apply to offenses committed before as well as after it enters into force.

(2) This Supplementary Treaty shall not apply to requests for extradition made prior to its entry into force.

## Article 8

(1) This Supplementary Treaty shall form an integral part of the bilateral extradition treaty.

(2) This Supplementary Treaty shall be subject to the completion by the United States of America and the Federal Republic of Germany of their respective applicable internal procedures for entry into force. The Contracting Parties shall thereupon notify each other that such internal procedures have been completed.

7

(3) This Supplementary Treaty shall enter into force on the date of entry into force of the U.S.-EU Extradition Agreement.

(4) In the event of termination of the U.S.-EU Extradition Agreement, this Supplementary Treaty shall be terminated.

DONE at Washington, this 18 day of April 2006, in duplicate, in the English and German languages, both texts being equally authentic.

For the Government of the                    For the Government of the
United States of America:                    Federal Republic of Germany:



Botschaft
der Bundesrepublik Deutschland    MOORE - EXT request from Germany - 0051    1:25-mj-02312-JMC
Washington

Please refer in reply: RK 531.41 SE Moore

### Note Verbale 56 / 2025

The Embassy of the Federal Republic of Germany presents its compliments to the US Department of State and, referring to Art. 29 of the Extradition Treaty between the Federal Republic of Germany and the United States of America of 1978 in the version of the Second Supplementary Agreement to the Extradition Treaty of 2006, has the honor to

forward the attached information by the public prosecution office in Kaiserslautern regarding the extradition of the US-citizen **Mr. Dominic Jason MOORE**, born on December 22nd 1995 in Virginia, SSN: **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**, currently residing in 6810 Park Heights Avenue, Apartment 407, Baltimore, Maryland 21215, USA to be prosecuted for the crimes cited in the arrest warrant of the Regional Court in Kaiserslautern/Germany, case number 5 Qs 86/24 of August 20, 2024.

Germany intends to have the individual picked up by German officers in the US and to fly him to Germany at German government expense. For the handover of the individual, the US is asked to suggest an airport that provides a nonstop air service to Germany.

The personal data transmitted may be used solely for the purpose for which they were transmitted. The data may not be forwarded to other States or to international or supranational organizations without prior approval from the Government of the Federal Republic of Germany.

The evidence and information transmitted from Germany may be used for any investigative and trial purposes, including with regard to third persons, provided that it may not be introduced:

    a. in any trial for purposes of seeking to convict any person of an offence for which the death penalty could be imposed; and

    b. in proceedings before extraordinary courts;

absent prior consent from the Federal Republic of Germany.

- 2 -

A copy of this Note Verbale and copies of the relevant judicial documents are included for the US Department of Justice.

The Embassy of the Federal Republic of Germany avails itself of this opportunity to renew to the US Department of State the assurances of its highest consideration.

Washington, D.C., May 28, 2025



U.S. Department of State
Office of Law Enforcement
and Intelligence (L/LEI)
2201 C-Street, N.W.
Washington, D.C. 20520

**RheinlandPfalz**

STAATSANWALTSCHAFT
KAISERSLAUTERN

Staatsanwaltschaft | Postfach 03560 | 67623 Kaiserslautern

U.S. Department of Justice
Criminal Division, Office of
International Affairs
950 Pennsylvania Avenue, NW
WASHINGTON DC 20530-0001
VEREINIGTE STAATEN

Bahnhofstraße 24
67655 Kaiserslautern
Telefon: 0631 3721-0
Telefax: 0631 3721-285
stakl@genstazw.jm.rlp.de
www.stakl.justiz.rlp.de

05.03.2025

| **Mein Aktenzeichen** | **Ihr Schreiben vom** | **Ansprechpartner(in) / E-Mail** | **Telefon / Fax** |
|---|---|---|---|
| 6035 Js 13657/24 | | Frau Rumpf | 0631/3721 277 |
| Bitte immer angeben! | | | 0631/3721 285 |

**Rechtshilfeverkehr in strafrechtlichen Angelegenheiten mit den Vereinigten Staaten von Amerika**

**Hier: Ersuchen um Auslieferung des Dominic Jason Moore, geb. am 22.12.1995 in Virginia, auf Grundlage des Auslieferungsvertrages vom 20. Juni 1978 zwischen der Bundesrepublik Deutschland und den Vereinigten Staaten von Amerika in der Fassung des Zweiten Zusatzvertrages vom 18. April 2006**

**Ermittlungsverfahren gegen Dominic Jason Moore, geb. am 22.12.1995 in Virginia, U.S.A., Staatsangehörigkeit: amerikanisch, SSN: 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, 6810 Park Heights Avenue, Apartment 407, Baltimore, Maryland 21215.**
**wegen Totschlags**

Anlagen:
- Haftbefehl des Landgerichts Kaiserslautern vom 20.08.2024 unter dem Aktenzeichen 5 Qs 86/24 samt Übersetzung
- Lichtbild des Reisepasses des Dominic Jason Moore mit der Passnummer 535472942

Sehr geehrte Damen und Herren,

| **Sprechzeiten** | **Bankverbindung** | **Verkehrsanbindung** | **Parkmöglichkeiten** |
|---|---|---|---|
| Montag-Freitag | Postbank Ludwigshafen | Deutsche Bahn bis Haupt- | Parkhaus Hauptbahnhof - |
| 9:00-12:00 Uhr | IBAN: DE51 5451 0067 0001 4136 77 | bahnhof | Zollamtstraße |
| sowie nach Vereinbarung | BIC: PBNKDEFF | | |

Datenschutzhinweis:

MOORE - EXT request from Germany - 0054

1:25-mj-02312-JMC



RheinlandPfalz

STAATSANWALTSCHAFT
KAISERSLAUTERN

mein Name ist Dr. Udo Gehring, ich bin 63 Jahre alt und lebe in Neustadt an der Weinstraße in der Nähe von Kaiserslautern, Deutschland. Seit dem 01.03.1991 bekleide ich das Amt eines Staatsanwalts des Landes Rheinland-Pfalz. Seit 01.02.2014 bin ich Leiter der Staatsanwaltschaft Kaiserslautern.

In dieser Eigenschaft führe ich unter dem Aktenzeichen 6035 Js 13657/24 ein Ermittlungsverfahren gegen den amerikanischen Staatsangehörigen Dominic Jason Moore wegen Totschlags.

Nach den bisherigen Ermittlungen ist Dominic Jason Moore dringend tatverdächtig, am 03.08.2024 gegen 8:00 Uhr im Gebäude 2004 auf dem Gelände der Air Base Vogelweh, Haderwald, 67661 Kaiserslautern, Deutschland, den damals 63-jährigen tunesischen Staatsangehörigen Samir Mziou attackiert und durch Drosseln und Würgen so lange auf den Hals des Geschädigten eingewirkt zu haben, bis dieser zu Boden ging und letztlich verstarb, was der Beschuldigte zumindest billigend in Kauf nahm.

## 1. Zu dem Tatvorwurf im Einzelnen:

Der Beschuldigte Dominic Jason Moore arbeitete seit dem 01.08.2024 bei der Firma Toukabri Schadstoff- und Umwelttechnik, die mit Abrissarbeiten auf dem Gelände der Air Base Vogelweh, Haderwald, 67661 Kaiserslautern, Deutschland, beauftragt war. Der verstorbene 63-jährige tunesische Staatsangehörige Samir Mziou war als Vorarbeiter ebenfalls bei dieser Firma angestellt.

Am 03.08.2024 sollten sowohl der Beschuldigte als auch der Geschädigte erneut auf der Baustelle arbeiten. Die Abrissarbeiten selbst fanden dabei in den Gebäuden 2000 und 2007 statt. In Gebäude 2004, dem späteren Tatort, wurden Werkzeuge gelagert und es bestand die Möglichkeit sich umzuziehen. Der gesamte Baustellenbereich, zu dem auch das Gebäude 2004 gehörte, war umzäunt. Es fand eine Einlasskontrolle am Gate der Air Base statt. Der Beschuldigte wurde von seinem Arbeitgeber, dem Zeugen Amir Toukabri, um 7:53 Uhr am Gate eingeschrieben und sodann vor Gebäude 2007 abgesetzt. Die weiteren Mitarbeiter befanden sich zu diesem Zeitpunkt bereits auf der Baustelle und hatten die Arbeit in den Gebäuden 2000 und 2007 bereits aufgenommen. Der Zeuge Amir Toukabri wies den Beschuldigten an, sich fußläufig zu Gebäude 2004 zu begeben und sich vor der Arbeitsaufnahme umzuziehen. Etwa zur selben Zeit fuhr der Geschädigte Samir Mziou mit einem Pritschenwagen zu Gebäude 2004, um dort eine Kiste Akkuschrauber-Bits zu holen, die auf der Baustelle benötigt wurden. Der Geschädigte stellt dabei das Fahrzeug mit laufendem Motor vor dem Eingang ab, begab sich ins Gebäude, nahm den Koffer mit den Bits aus dem Werkzeugraum (Raum 3) und begab sich Richtung Ausgang zurück in den Flur. Der Beschuldigte seinerseits begab sich zunächst in Raum 2, stellte dort seinen Rucksack ab und zog eine schwarze Arbeitshose an und sein graues T-Shirt aus. Weitere Personen befanden sich zu diesem Zeitpunkt nicht am oder im Gebäude 2004. Im weiteren Verlauf attackierte der Beschuldigte den Samir Mziou im Flur direkt hinter der Zugangstür zu Gebäude 2004. Dabei

1:25-mj-02312-JMC


**RheinlandPfalz**

STAATSANWALTSCHAFT
KAISERSLAUTERN

verlor der Geschädigte seine Gebissprothese des Unterkiefers und erlitt Einblutungen der linken Wange und rechten Schläfenregion. Sodann würgte der Beschuldigte den Geschädigten mit seinem grauen T-Shirt in der Hand mit beiden Händen bis zum Tode, wobei er den Tod des Geschädigten zumindest billigend in Kauf nahm. Das T-Shirt befand sich dabei zumindest teilweise zwischen den Händen des Beschuldigten und dem Hals des Geschädigten. Ein Motiv für den Angriff konnte nicht festgestellt werden. Im Anschluss zog der Beschuldigte den Geschädigten den Flur entlang bis zum etwa 25m entfernten vorletzten Raum des Gebäudes 2004, nämlich Raum 6, und legte ihn dort in der linken Ecke ab. Dieser Raum war leer und wurde von den Mitarbeitern normalerweise nicht genutzt. Danach begab sich der Beschuldigte oberkörperfrei und mit seinem T-Shirt in der Hand zurück in Richtung seines Rucksacks in Raum 2 als die Zeugen Amir Toukabri und Mohamed Ezzraibi auf der Suche nach dem Beschuldigten gegen 8:25 Uhr das Gebäude betraten. Auf die Frage des Zeugen Toukabri, wo sich der Samir Mziou befinde, gab der Beschuldigte zunächst keine Antwort, sondern ging wortlos zu seinem Rucksack, entnahm diesem ein schwarzes T-Shirt und zog es an. Auf nochmalige Frage antwortete er mit „Nein". Der Zeuge Eimen Toukabri hatte bereits um 8:17 Uhr erfolglos versucht den Geschädigten auf dessen Mobiltelefon zu erreichen, weil er sich über dessen langes Ausbleiben wunderte. Daraufhin waren die Zeugen Amir Toukabri und Mohamed Ezzraibi zu Gebäude 2004 gefahren. Nachdem der Zeuge Amir Toukabri den Geschädigten leblos in Raum 6 liegend aufgefunden hatte, verständigte Amir Toukabri den Eimen Toukabri um 8:27 Uhr über das Auffinden des Geschädigten und setzte um 8:28 Uhr einen Notruf ab. Die zunächst durch die Notärztin eingeleiteten Reanimationsmaßnahmen wurden um 09:03 Uhr beendet und der Geschädigte für Tod erklärt.

## 2. Dringender Tatverdacht

Der oben beschriebene Tatablauf ergibt sich aus der Vernehmung der Zeugen Amir Toukabri, Eimen Toukabri und Mohamed Ezzraibi sowie den Feststellungen der Polizeibeamten, der rechtsmedizinischen Sachverständigen und der Sachverständigen des Landeskriminalamts von Rheinland-Pfalz.

a) Aus den durchgeführten Ermittlungen ergibt sich, dass die Gewalteinwirkung auf den Samir Mziou zwischen kurz nach 8:00 Uhr und 8:27 Uhr im Gebäude 2004 erfolgte und nur der Beschuldigte zur Tatzeit zugegen war.

Zunächst wurde das Protokoll der Einschreibungen am Gate der US-Liegenschaft durch Kriminaloberkommissar Haardt der Kriminalpolizei Kaiserslautern eingesehen und festgestellt, dass der Beschuldigte durch den Zeugen Amir Toukabri am 03.08.2024 um 7:53 Uhr eingeschrieben wurde und das Militärgelände betrat.

Der deutsch-tunesische Diplom-Ingenieur Amir Toukabri legte den Arbeitsvertrag zwischen seiner Firma Toukabri Schadstoff- und Umwelttechnik und dem Beschuldigten Moore vom 23.07.2024 vor aus dem sich der Beginn der Beschäftigung mit dem 01.08.2024 ergab. Der Zeuge Amir Toukabri gab in seiner Vernehmung durch deutsche Kriminalbeamte an, dass er

1:25-mj-02312-JMC



Rheinland Pfalz

STAATSANWALTSCHAFT
KAISERSLAUTERN

den Beschuldigten in dessen Unterkunft, die ihm durch die Firma zur Verfügung gestellt wurde, am 03.08.2024 mit seinem Auto abgeholt und zur Baustelle gebracht habe. Er habe ihn auch am Gate eingeschrieben, da der Beschuldigte noch keinen eigenen ID-Pass hatte. Er habe ihn bei Gebäude 2007 abgesetzt und aufgefordert, zu Fuß zu Gebäude 2004 zu gehen und sich dort umzuziehen, da er noch Shorts und keine Arbeitshosen trug. Zu diesem Zeitpunkt trug der Beschuldigte ein graues T-Shirt. Er habe dann noch gesehen, dass der Beschuldigte mit seinem Rucksack zu Fuß losgelaufen sei in Richtung des Gebäudes 2004. Da vom Akkuschrauber der BIT-Kasten gefehlt habe, sei der Geschädigte Samir Mziou ebenfalls zum Gebäude 2004 aufgebrochen, um den dort im Werkzeugraum stehenden BIT-Kasten zu holen. Der Zeugen Amir Toukabri gab an, gesehen zu haben, wie der Geschädigte mit seinem Helm bekleidet ins Auto gestiegen und allein losgefahren sei. Wer zuerst am Gebäude 2004 angekommen sei, könne er nicht sagen, da Samir Mziou zwar kurz nach dem Beschuldigten, aber mit dem Pritschenwagen aufgebrochen sei. Alle anderen Mitarbeiter seien bereits auf der Baustelle am Arbeiten gewesen. Nach etwa 10 Minuten habe der Eimen Toukabri den Samir Mziou angerufen, da dieser noch nicht zurück war und auf der Baustelle Werkzeug benötigt wurde, das sich auf dem von Samir Mziou genutzten Pritschenwagen befand. Der Anruf wurde nicht angenommen. Er sei dann kurze Zeit später zusammen mit dem Zeugen Mohamed Ezzraibi zu Gebäude 2004 gefahren, um nachzusehen, warum weder der Geschädigte noch der Beschuldigte zurückkamen und um ein Laptopkabel aus Gebäude 2004 zu holen. Er habe den Zeugen Ezzraibi direkt im Anschluss nach Hause fahren wollen, deshalb sei dieser mitgekommen. Beim Eintreffen am Gebäude 2004 sei ihm aufgefallen, dass der vom Geschädigten gefahrene Pritschenwagen vor der Eingangstür mit laufendem Motor und angeschaltetem Licht geparkt war. Bei Betreten des Gebäudes sei ihm der Beschuldigte in schwarzer Arbeitshose und oberkörperfrei entgegen gekommen. Er habe ihn gefragt, ob er Samir gesehen habe. Der Beschuldigte habe zunächst nicht geantwortet. Auf nochmalige Frage habe er „Nein" gesagt. Der Zeuge Amir Toukabri gibt an, dann zunächst in den Toiletten nach dem Geschädigten gesucht zu haben. Dann sei er zurück zum Zeuge Ezzraibi gegangen, der im Eingangsbereich gewartet habe. Da dieser den Geschädigten auch nicht gesehen hatte, sei er erneut in das Gebäude gegangen und habe jede Tür geöffnet und erst im vorletzten Raum nach Öffnen der geschlossenen Tür den Geschädigten in einer Ecke liegend aufgefunden. Samir Mziou sei bewusstlos gewesen und im Gesicht blau angelaufen. Er habe auf der rechten Körperseite gelegen, beide Arme über dem Kopf ausgestreckt. Dieser Raum sei laut dem Zeugen Amir Toukabri zwar nie verschlossen, werde aber auch nicht genutzt. Er habe geschrieen, woraufhin der Zeuge Ezzraibi angerannt gekommen sei. Er habe dann erst kurz selbst versucht, Samir Mziou wiederzubeleben, dann jedoch erst seinen Bruder Eimen Toukabri und danach direkt den Notruf gewählt. Der Zeuge Eimen Toukabri sei dann gekommen und habe mit der Wiederbelebung begonnen und er sei mit dem Auto zur Polizeistation gefahren und habe dort die Zeugin Pfaff der Militärpolizei verständigt, die dann als erste Beamtin zum Tatort eilte und die Wiederbelebungsmaßnahmen fortsetzte. Danach habe er den Beschuldigten gesucht, da er den Verdacht hatte, dass dieser Schuld am Zustand des Samir Mziou war. Es sei ihm insbesondere komisch vorgekommen, dass der Geschädigte in diesem letzten Raum bei geschlossener Tür gelegen habe, da er in diesem Raum nichts zu suchen hatte. Und der Beschuldigte sei als einziger am Gebäude 2004

1:25-mj-02312-JMC



**Rheinland**Pfalz

STAATSANWALTSCHAFT
KAISERSLAUTERN

gewesen. Er habe den Beschuldigten am Gebäude 2007, sprich auf der Baustelle, angetroffen, wobei er zu diesem Zeitpunkt ein dunkles T-Shirt trug. Er habe den Beschuldigten dann mit zurück zu Gebäude 2004 genommen und dort der Militärpolizei übergeben und geäußert, dass er den Verdacht habe, dass der Beschuldigten Samir Mziou getötet habe. Es habe bereits am ersten Arbeitstag, dem 01.08.2024, eine Meinungsverschiedenheit zwischen dem Beschuldigten und dem Geschädigten gegeben. Der Geschädigte hatte sich bei ihm beschwert, dass der Beschuldigte nicht richtig schleifen könne und nicht auf ihn - den Vorarbeiter - hören würde.

Der Zeuge Eimen Toukabri wurde ebenfalls durch deutsche Kriminalbeamte vernommen und hat angegeben, dass der Geschädigte Samir Mziou ihm gegenüber geäußert habe, dass er noch Bits holen gehe. Er habe dann auf dessen Rückkehr gewartet. Irgendwann habe er sich gefragt, wo der Geschädigte bleibe und versucht diesen anzurufen. Der Samir Mziou habe das Telefonat jedoch nicht angenommen. Kurz darauf sei der Zeuge Amir Toukabri zusammen mit dem Mohamed Ezzraibi losgefahren zu Gebäude 2004 und um 08:27 Uhr habe dieser ihn dann verständigt, dass Samir ohnmächtig sei. Er sei daraufhin ebenfalls zu Gebäude 2004 gefahren und habe mit der Wiederbelebung begonnen bis sein Bruder, der Zeuge Amir Toukabri, mit einer Frau vom Militär kam, die die Wiederbelebungsmaßnahmen fortgesetzt habe. Bei den Wiederbelebungsmaßnahmen sei ihm aufgefallen, dass ein Teil der Gebissprothese des Geschädigten fehlte. Er habe dann vor dem Gebäude 2004 gewartet. Der Beschuldigte habe da auf einem Stuhl gesessen und sei von der amerikanischen Militärpolizei bewacht worden. Der Zeuge gibt an, dass er gesehen hat, dass der Beschuldigte eine Dose Energy-Drink aus seinem Rucksack genommen habe und aus dieser getrunken habe. Er habe auch gesehen, dass der Beschuldigte aus der Dose Flüssigkeit in seinen Rucksack geschüttet habe.

Der Zeuge Mohamed Ezzraibi hat in seiner Vernehmung durch deutsche Kriminalbeamte die Angaben des Zeugen Amir Toukabri bestätigt und darüber hinaus noch folgende Angaben gemacht: Er habe bei Betreten des Gebäudes 2004 wahrgenommen, dass der Beschuldigte ein graues T-Shirt in der Hand gehalten habe.

Die drei Zeugen Amir Toukabri, Eimen Toukabri und Mohamed Ezzraibi haben alle drei angegeben, dass sie keine weiteren Personen am oder im Gebäude 2004 oder auf dem Weg vom beziehungsweise zum Gebäude 2004 wahrgenommen haben. Es hätten sich alle anderen Arbeiter auf der Baustelle befunden.

Der Laufweg von Gebäude 2007 zu Gebäude 2004 beträgt etwa 2 Minuten 40 Sekunden, der Fahrweg etwa 1 Minute 20 Sekunden, was von Kriminalhauptkommissar Müller der Kriminalpolizei Kaiserslautern überprüft wurde. Der Tatort wurde zudem vom Landeskriminalamt Rheinland-Pfalz vermessen und dies fotografisch dokumentiert.

Durch Kriminalhauptkommissar Müller wurde das vom Verstorbenen mitgeführte Smartphone eingesehen und der verpasste Anruf des Eimen Toukabri um 8:17 Uhr im Anrufprotokoll



festgestellt. Ebenso wurde das Smartphone des Amir Toukabri eingesehen und die Telefonate um 8:27 Uhr und 8:28 Uhr im Anrufprotokoll festgestellt. Der Notruf um 8:28:27 Uhr wurde aufgezeichnet und dokumentiert.

Die Zeugin Karly R. Pfaff der 2nd Military Police Company bestätigte die Angaben des Zeugen Amir Toukabri und gab an, dass sie sich im Kontrollraum des Provost Marshal Office befunden habe, als ein ihr unbekannter Mann angerannt kam und sagte, er benötige den Rettungsdienst, da es auf der Baustelle einen medizinischen Notfall gegeben habe. Der unbekannte Mann habe sie sodann in einen Raum ganz im hinteren Teil des Gebäudes 2004 geführt, wo der später verstorbene Samir Mziou gelegen habe. Die Zeugin Karly R. Pfaff begann sodann mit Wiederbelebungsmaßnahmen. Nachdem sie abgelöst wurde, fragte sie den sehr aufgeregten Mann (den Zeugen Amir Toukabri), was passiert sei. Dieser berichtete von seinen Beobachtungen und seinem Verdacht entsprechend seiner späteren Angaben gegenüber der deutschen Kriminalpolizei in der förmlichen Vernehmung.

b) Die Spurensicherung wurde noch am 03.08.2024 durch die Kriminaltechnik der Kriminalpolizei Kaiserslautern vorgenommen und dabei der gesamte erweiterte Tatort auch mittels Lichtbildern dokumentiert. Dabei wurde im Werkzeugraum der Helm des Verstorbenen auf dem Boden liegend festgestellt. Im Flur wurde eine Tasche mit Werkzeugzubehör dokumentiert. Im Flur links neben dem Türrahmen zum Werkzeugraum wurde die Gebissprothese des Unterkiefers des Verstorbenen auf dem Boden liegend festgestellt und sichergestellt.

Kriminialhauptkommissar Müller überprüfte am 07.08.2024 die gesamte Zaunanlage rund um das Baustellengelände und dokumentierte diese mit Lichtbildern. Es konnten keine Beschädigungen an der Zaunanlage festgestellt werden. Die Zäune waren lückenlos geschlossen. Auch die Vegetation um die Zaunanlage war nicht sichtlich auffällig herunter getreten.

c) Der Beschuldigte Dominic Jason Moore wurde zunächst von Senior Airman Taylor Mustain, Senior Airman Tristan Mustain und Army Staff Sergeant Ross als Beschuldigter belehrt, vorläufig festgenommen, durchsucht und am 03.08.2024 um 9:24 Uhr in den Gewahrsam verbracht. Der Beschuldigte habe laut den Zeugen nicht nachgefragt, warum er die Handschellen angelegt bekomme. Er sei auffallend ruhig gewesen, als sei nichts geschehen. In der Gewahrsamszelle habe er zudem auffallend viele Push-Ups und Dehnungsübungen gemacht, was die Zeugen beobachten konnten. Army Staff Sergeant Ross gab an, er habe im Rahmen der Durchsuchung auch den vom Beschuldigten mitgeführten Rucksack an sich genommen und von allen Gegenständen Lichtbilder gefertigt, so auch von dem mitgeführten und dem Rechtshilfeersuchen als Lichtbild beigelegten Reisepass des Beschuldigten. Dabei stellte er fest, dass es sich bei der festgenommenen und tatverdächtigten Person um den Inhaber des Reisepasses, den Beschuldigten Dominic Jason Moore, handelt. Der Zeuge Ross stellte dabei ein graues T-Shirt im Rucksack des Beschuldigten fest, sicherte dieses in einem Beweismittelbeutel und übergab es Kriminaloberkommissarin Huber der deutschen

MOORE - EXT request from Germany - 0059

1:25-mj-02312-JMC



**Rheinland Pfalz**

STAATSANWALTSCHAFT
KAISERSLAUTERN

Kriminalpolizei. Die Zeugen stellten in Übereinstimmung mit den Angaben des Zeugen Eimen Toukabri fest, dass das graue T-Shirt feucht war.

Die Staatsanwaltschaft Kaiserslautern hat in der Folge Antrag auf Erlass eines Haftbefehls beim zuständigen Amtsgericht Kaiserslautern gestellt. Dieser Antrag wurde abgelehnt. Auf die Beschwerde der Staatsanwaltschaft Kaiserslautern hat das Landgericht Kaiserslautern in der Folge den angefügten Haftbefehl vom 20.08.2024 erlassen. In der Zwischenzeit war der Beschuldigten geflüchtet und hält sich nach den nun über die Kaiserslautern Resident Agency der Department of the Army Criminal Investigation Division erlangten Erkenntnissen unter der Anschrift 6810 Park Heights Avenue, Apartment 407, Baltimore, Maryland 21215, auf. Der Beschuldigte hat vom 15.11.2016 bis 20.10.2021 als Soldat bei der U.S. Armee gedient.

d) Im Rahmen der Obduktion durch die rechtsmedizinischen Sachverständigen Dr. Ramsthaler und F. Behne des Instituts für Rechtsmedizin Homburg / Saar am 04.08.2024 wurde folgendes festgestellt: Beidseitige Einblutungen der Halsweichgewebe mit Betonung der tieferen Schichten der Halsmuskulatur sowie unmittelbar am Kehlkopf, einen frischen Abbruch des rechten Kehlkopfoberhornes sowie Einblutungen im Postikus-Muskel. Daneben fanden sich massive Erstickungsblutungen nach Tardieu in der Lunge sowie petechiale Einblutungen der Lidbindehäute. Zudem fanden sich frische Hauteinblutungen der linken Wange und rechten Schläfenregion. Es fanden sich keine Hinweise auf Angriffs- oder Abwehrverletzungen. Ein Hinweis auf eine natürliche Todesursache war nicht feststellbar.

Nach den Angaben der Rechtsmediziner besteht aufgrund ihrer Feststellungen bei der Obduktion der dringende Verdacht einer tödlichen Halskompression durch fremde Hand. Angesichts fehlender typischer äußerer Hautveränderungen an der Halsregion erscheint ein direkter manueller Angriff mittels Würgen mit „nackter Hand" wenig wahrscheinlich. Vorstellbar bliebe indes ein Würgeangriff, bei dem eine mittelbare Kompression zum Beispiel durch Unterlegen eines Textils stattgefunden hat. Auch ein Drosselvorgang oder ein Zusammenwirken beider Mechanismen käme in Betracht, sofern das Drosselwerkzeug breit genug angelegt wurde und damit die Gewalt erklärbar weder typische Würgemale an der Haut, noch Einschnürungen im Sinne einer Drosselmarke hinterlassen hat.

Die festgestellten frischen Hauteinblutungen an der linken Wange und rechten Schläfenregion können laut Aussage der rechtsmedizinischen Sachverständigen mit einem Schlag mit der flachen Hand oder Faust in Einklang gebracht werden.

e) Dem Beschuldigten wurde am 03.08.2024 durch Kriminalkommissar Morsch eine Speichelprobe entnommen zum Abgleich mit am Tatort gesicherten DNA-Spuren. Zudem wurde auch an ihm eine Spurensicherung in Form von Abrieben durchgeführt.

Die Speichelprobe wurde mit DNA-enthaltenden Spuren abgeglichen, die am Leichnam gesichert werden konnten. Zudem wurde die am Leichnam erhobene DNA des Geschädigten mit den Spuren abgeglichen, die am Beschuldigten sowie dem sichergestellten grauen T-Shirt

MOORE - EXT request from Germany - 0060

1:25-mj-02312-JMC



**RheinlandPfalz**

STAATSANWALTSCHAFT
KAISERSLAUTERN

des Beschuldigten gesichert werden konnten. Die Auswertung der Spuren und der Abgleich mit der erhobenen DNA des Beschuldigten und des Opfers erfolgte durch die Sachverständige für forensische DNA-Analyse des Landeskriminalamts Rheinland-Pfalz Dr. Michaela Groß.

Die Auswertung der Mischspur des Abriebs am rechten Daumen des Opfers ergab eine Übereinstimmung in allen 16 Merkmalsystemen mit dem DNA-Profil des Beschuldigten. Dies sprich nach den Ausführungen der Sachverständigen Dr. Groß mit höchster Wahrscheinlichkeit dafür, dass die Spur am rechten Daumen des Opfers durch den Beschuldigten verursacht wurde. Nach ihren Feststellungen ist es mehr als 30 Milliarden-mal wahrscheinlicher, dass die in der Mischspur festgestellte Merkmalskonstellation vom Geschädigten und dem Beschuldigten stammt, als wenn diese vom Geschädigten und von einer unbekannten, mit dem Beschuldigten nicht verwandten, Person stammt.

Die in der Mischspur am rechten kleinen Finger des Beschuldigten und für den Geschädigten nachgewiesenen DNA-Merkmale stimmen in allen 16 analysierten StR-Merkmalssystemen überein. Es handelt sich um ein Mischprofil, das eine Merkmalskonstellation aufweist, wie es aus den Mustern des Beschuldigten und des Geschädigten resultieren würde. Nach den Feststellungen der Sachverständigen ist es mehr als 30-Milliarden-mal wahrscheinlicher zu beobachten, wenn die Merkmale vom Beschuldigten und von dem Opfer stammen, als wenn diese vom Beschuldigten und einer unbekannten, mit dem Opfer nicht verwandten Person stammen.

Daneben kann der Beschuldigte als anteiliger Spurenverursacher der folgenden Mischspuren nicht ausgeschlossen werden: Jeanshose des Opfers, T-Shirt des Opfers, Handabriebe des Opfers und Halsabriebe des Opfers. Andererseits kann der Geschädigte als anteiliger Spurenverursacher von Mischspuren an den Handabrieben des Beschuldigten und an dessen grauem T-Shirt nicht ausgeschlossen werden.

### 3. Rechtliche Würdigung

Der Beschuldigte steht bei dem gegebenen Sachverhalt im dringenden Tatverdacht, sich wegen Totschlags strafbar gemacht zu haben.

Die einschlägige Strafnorm, welche Totschlag unter Strafe stellt, lautet wie folgt:

Paragraph 212 Strafgesetzbuch (Totschlag)

(1) Wer einen Menschen tötet, ohne Mörder zu sein, wird als Totschläger mit Freiheitsstrafe nicht unter fünf Jahren bestraft.

(2) In besonders schweren Fällen ist auf lebenslange Freiheitsstrafe zu erkennen.

MOORE - EXT request from Germany - 0061

1:25-mj-02312-JMC



RheinlandPfalz

STAATSANWALTSCHAFT
KAISERSLAUTERN

## 4. Verjährung

Verjährung ist bislang nicht eingetreten. Nach deutschem Recht verjährt Totschlag gemäß § 78 Absatz 3 Nummer 2 des Strafgesetzbuchs nach einer Verjährungsfrist von 20 Jahren.

Paragraph 78 Strafgesetzbuch (Verjährungsfrist)

...

(3) Soweit die Verfolgung verjährt, beträgt die Verjährungsfrist

1. dreißig Jahre bei Taten, die mit lebenslanger Freiheitsstrafe bedroht sind,

2. zwanzig Jahre bei Taten, die im Höchstmaß mit Freiheitsstrafe von mehr als zehn Jahren bedroht sind,

...

## 5. Ersuchte Maßnahme

Die Ermittlungen der deutschen Behörden hat nun ergeben, dass sich der männliche Beschuldigte Dominic Jason Moore in den Vereinigten Staaten von Amerika aufhält und zwar unter der Anschrift 6810 Park Heights Avenue, Apartment 407, Baltimore, Maryland 21215.

Ich bitte höflichst den amerikanischen Staatsangehörigen Dominic Jason Moore, geboren am 22.12.1995 in Virginia, derzeitiger Aufenthaltsort vermutlich unter der Anschrift 6810 Park Heights Avenue, Apartment 407, Baltimore, Maryland 21215, zur Verfolgung der im beigefügten Haftbefehl des Landgerichts Kaiserslautern vom 20.08.2024, Aktenzeichen 5 Qs 86/24 genannten Straftat, nämlich des Totschlags zum Nachteil des Samir Mziou, auszuliefern. Ich bitte den Verfolgten bis zum Vollzug der Auslieferung in Auslieferungshaft zu nehmen und beim Vollzug der Auslieferung mitzuteilen, während welcher Zeit der Verfolgte infolge des Auslieferungsersuchens in Haft gehalten wurde.

Ich teile bereits an dieser Stelle mit, dass beabsichtigt ist, den Verfolgten von deutschen Beamten in den Vereinigten Staaten von Amerika abholen zu lassen und ihn auf Kosten der deutschen Strafverfolgungsbehörden auf dem Luftweg in die Bundesrepublik Deutschland zu überstellen.

Unter Bezugnahme auf Artikel 14 des Rechtshilfevertrages zwischen den Vereinigten Staaten von Amerika und Deutschland bitte ich Sie höflichst das Ersuchen und den Inhalt vertraulich zu behandeln, da die Offenbarung den Erfolg des Ermittlungsverfahrens gefährden könnte. Angesichts der erheblichen Straftat und Strafandrohung ist zu befürchten, dass der Beschuldigte sich der Verhaftung und Auslieferung erneut durch Flucht entziehen könnte.

MOORE - EXT request from Germany - 0062



**Rheinland Pfalz**

STAATSANWALTSCHAFT
KAISERSLAUTERN

Als Kontaktpersonen und im Fall von Rückfragen stehen Ihnen die sachbearbeitende Staatsanwältin Angelika Rumpf und ihr Vertreter, Oberstaatsanwalt Stefan Orthen, der Staatsanwaltschaft Kaiserslautern unter der Telefonnummer 0049/631/3721-220 oder - 299 oder und der Email-Adresse stakl@genstazw.jm.rlp.de zur Verfügung.

Für Ihre Bemühungen bedanke ich mich im Voraus.

Mit vorzüglicher Hochachtung

(Dr. Gehring)
Leitender Oberstaatsanwalt

## CERTIFIED TRANSLATION FROM GERMAN

*[Coat of Arms]* **Rhineland Palatinate**
PUBLIC PROSECUTOR'S OFFICE OF KAISERSLAUTERN

Staatsanwaltschaft | Postfach 03560 | 67623 Kaiserslautern

U.S. Department of Justice
Criminal Division, Office of
International Affairs
950 Pennsylvania Avenue, NW
WASHINGTON DC 20530-0001
UNITED STATES

Bahnhofstraße 24
67655 Kaiserslautern
Tel.:         +49 (631) 3721-0
Telefax:    +49 (631) 3721-285
stakl@genstazw.jm.rlp.de
www.stakl.justiz.rlp.de

March 05th, 2025

| **My Reference**<br>6035 Js  13657/24<br>Please always specify! | **Your letter dated** | **Contact partner / E-mail**<br>Ms. Rumpf | **Telephone / Fax**<br>+49 (631) 3721-277<br>+49 (631) 3721-285 |
|---|---|---|---|

**Legal assistance in criminal matters with the United States of America**

**Here:  Request for the extradition of Dominic Jason Moore, born on December 22nd, 1995 in Virginia, on the basis of the Extradition Treaty dated June 20th, 1978 between the Federal Republic of Germany and the United States of America, as amended by the Second Supplementary Agreement on April 2006**

**Investigation procedure against Dominic Jason Moore, born on December 22nd, 1995 in Virginia, U.S.A., and citizenship: American, SSN: 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, 6810 Park Heights Avenue, Apartment 407, Baltimore, Maryland 21215.**

**For Second-degree murder**

Attachments:

-       Arrest warrant of the Kaiserslautern District Court dated August 20th, 2024 under the Reference Number 5 QS 86/24 including translation

-       Photograph of Dominic Jason Moore's passport with the number 535472942

Dear Sir or Madam,

1 / 10

| **Office hours**<br>Mondays - Fridays<br>09:00 am – 12:00 pm<br>and as agreed | **Bank account**<br>Postbank Ludwigshafen<br>IBAN: DE51 5451 0067 0001 4136 77<br>BIC: PBNKDEFF | **Transport links**<br>Deutsche Bahn until<br>Main Station | **Parking facilities**<br>Car park Main Station -<br>Zollamtstraße |
|---|---|---|---|

**Data Protection Note:**
Personal data is processed as part of the procedure. Information about your rights from the Basic Regulation on Data Protection (DS-GVO), the Code of Criminal Procedure (StPO) and the German Federal Data Protection Act (BDSG) can be found on our homepage: www.stakl.justiz.rlp.de. On request, the information can also be sent in paper form.

*[Coat of Arms]*    **Rhineland Palatinate**
PUBLIC PROSECUTOR'S OFFICE OF KAISERSLAUTERN

My name is Dr. Udo Gehring. I am 63 years old and live in Neustadt an der Weinstraße near Kaiserslautern, Germany. I have been serving as a Public Prosecutor for the Federal State of Rhineland-Palatinate since March 01st, 1991. Since February 01st, 2014, I have been the Head of the Kaiserslautern Public Prosecutor's Office.

In this capacity, I am conducting an investigation procedure under the Reference Number 6035 Js 13657/24 against the American citizen Dominic Jason Moore for second-degree murder.

According to the investigations so far, Dominic Jason Moore is strongly suspected of having attacked the then 63-year-old Tunisian citizen Samir Mziou on August 03rd, 2024, at around 08:00 a.m. in building 2004 on the grounds of the Air Base Vogelweh, Haderwald, 67661 Kaiserslautern, Germany, and of having throttled and choked the victim's neck until he fell to the ground and ultimately died, which the Defendant at least approved.

## 1. Relating the criminal charge in detail:

The Defendant, Dominic Jason Moore, had been working for Toukabri Schadstoff- und Umwelttechnik since August 01st, 2024. The company was contracted to carry out demolition work on the grounds of the Vogelweh Air Base, Haderwald, 67661 Kaiserslautern, Germany. The deceased, the 63-year-old Tunisian citizen Samir Mziou, was also employed with this company as a foreman.

On August 03rd, 2024, both the Defendant and the victim were scheduled to work on the construction site again. The demolition work itself took place in Buildings 2000 and 2007. In Building 2004, the later crime scene, tools were stored and there was an opportunity to change clothes. The entire construction site, which also included building 2004, was fenced off. There was an entry control at the air base gate. The Defendant was clocked in at the gate by his employer, the witness Amir Toukabri, at 07:53 a.m. and then dropped off in front of Building 2007. At that time, the other employees were already on site and had already started work in Buildings 2000 and 2007. The witness Amir Toukabri instructed the Defendant to walk to Building 2004 and change his clothes before starting work. At approximately the same time, the victim, Samir Mziou, drove a pickup truck to Building 2004 to pick up a box of cordless screwdriver bits needed for the construction site. The victim parked the vehicle with the engine running in front of the entrance, entered the building, took the box containing the bits from the tool room (Room 3), and returned to the hallway toward the exit. The Defendant, for his part, first went to Room 2, placed his backpack there, put on black work trousers, and put off his gray T-shirt. At that time, no other people were near to or inside Building 2004. In the further course, the Defendant attacked the victim, Samir Mziou, in the hallway directly behind the entrance door to Building 2004.

[Coat of Arms]   **Rhineland Palatinate**
PUBLIC PROSECUTOR'S OFFICE OF KAISERSLAUTERN

By doing so, the victim lost his lower artificial dentures and suffered bleeding in his left cheek and right temple. The Defendant then strangled the victim with both hands, clutching his gray T-shirt, until death, whereby he at least knowingly approved the victim's death. The T-shirt was at least partially between the Defendant's hands and the victim's neck. A motive for the attack could not be determined. The Defendant then dragged the victim down the corridor to the second-to-last room of Building 2004, Room 6, approximately 25 meters away, and placed him in the left corner. This room was empty and normally not used by employees. The Defendant then returned shirtless and with his T-shirt in his hand toward his backpack in Room 2 when the witnesses Amir Toukabri and Mohamed Ezzraibi entered the building in search of the Defendant at around 08:25 a.m. When the witness Toukabri asked where Samir Mziou was, the Defendant initially did not answer, but silently went to his backpack, took out a black T-shirt, and put it on. When asked again, he replied "No". The witness Eimen Toukabri had already tried unsuccessfully to reach the victim on his cell phone at 08:17 a.m., being surprised at his long absence. The witnesses Amir Toukabri and Mohamed Ezzraibi then drove to Building 2004. After the witness Amir Toukabri had found the victim lying lifeless in Room 6, he notified Eimen Toukabri at 08:27 a.m. about the victim's discovery. He gave an emergency call at 08:28 a.m. The resuscitation measures initially initiated by the emergency physician were terminated at 09:03 a.m. and the victim was pronounced dead.

## 2. Strong suspicion

The course of events described above is based on the questioning of the witnesses Amir Toukabri, Eimen Toukabri and Mohamed Ezzraibi as well as the findings of the police officers, the forensic experts and the experts of the State Office of Criminal Investigations of Rhineland-Palatinate.

a) The investigations conducted show that the forceful impact on Samir Mziou occurred between shortly after 08:00 a.m. and 08:27 a.m. in Building 2004 and that only the Defendant was present at the time of the crime.

At first, the logging in of the registrations at the gate of the US property was examined by Chief Inspector Haardt of the Kaiserslautern Criminal Investigation Department and it was found out that the Defendant was registered by witness Amir Toukabri on August 03rd, 2024, at 07:53 a.m. and that he entered the military premises at that time.

The German-Tunisian engineer Amir Toukabri presented the employment contract between his company Toukabri Schadstoff- und Umwelttechnik and the Defendant Moore dated July 23rd, 2024, which stated that employment would begin on August 01st, 2024. During his interrogation by German criminal investigators, the witness Amir Toukabri stated that he picked up the Defendant from his

MOORE - EXT request from Germany - 0066          1:25-mj-02312-JMC

*[Coat of Arms]*   **Rhineland Palatinate**
PUBLIC PROSECUTOR'S OFFICE OF KAISERSLAUTERN

accommodation, which was provided to him by the company, in his car on August 03rd, 2024, and gave him a lift to the construction site. He also registered him at the gate, as the Defendant did not yet have his own ID card. He dropped him off at Building 2007 and asked him to walk to Building 2004 and change his clothes there, as he was still wearing shorts and not work pants. At that time, the Defendant was wearing a gray T-shirt. He then saw the Defendant start walking with his backpack toward Building 2004. Since the BIT box was missing from the cordless screwdriver, the victim, Samir Mziou, also went to building 2004 to retrieve the BIT box located in the tool room there. The witness Amir Toukabri stated that he had seen the victim, wearing his helmet, get into his car and drive off alone. He could not say who arrived at building 2004 first, as Samir Mziou left shortly after the Defendant, but in a pickup truck. All other employees had already been working on the construction site. After about 10 minutes, Eimen Toukabri called Samir Mziou because he had not yet returned and on the construction site tools were needed that had been on the pickup truck used by Samir Mziou. The call was not answered. A short time later, he and the witness Mohamed Ezzraibi drove to Building 2004 to go and see why neither the victim nor the Defendant had returned and to retrieve a laptop cable from Building 2004. He wanted to drive the witness Ezzraibi home immediately afterwards, that's why Mr. Ezzraibi came with him. Upon arriving at Building 2004, he noticed that the pickup truck driven by the victim was parked in front of the entrance door with its engine running and its lights on. Upon entering the building, the Defendant approached him, wearing black work trousers and no shirt. He asked him if he had seen the victim. The Defendant initially did not answer. When asked again, he said "No." The witness Amir Toukabri states that he first looked for the victim in the restrooms. He then returned to the witness Ezzraibi, who was waiting in the entrance area. Since the witness Ezzraibi also hadn't seen the victim, he re-entered the building and opened every door. Only in the second-to-last room, after opening the closed door, did he find the victim lying in a corner. Samir Mziou was unconscious and his face was turned to blue. He was lying on his right side with both arms stretched above his head. According to the witness Amir Toukabri, this room was never locked but was also not used. He screamed, whereupon the witness Ezzraibi came running. He then briefly attempted to resuscitate Samir Mziou himself, but then called his brother Eimen Toukabri and immediately after that he called the emergency services. The witness Eimen Toukabri then arrived and began resuscitation. He drove to the police station and informed the witness Pfaff of the Military Police, who was the first officer to arrive on the scene and to continue resuscitation efforts. He then searched for the Defendant, suspecting that it was him to be responsible for Samir Mziou's condition. He found it particularly weird that the victim was lying in the last room with the door closed, as he had nothing to find in there. And the Defendant was the only person being in Building 2004.

*[Coat of Arms]*    **Rhineland Palatinate**
PUBLIC PROSECUTOR'S OFFICE OF KAISERSLAUTERN

He encountered the Defendant at building 2007, i.e., on the construction site, wearing a dark T-shirt at the time. He then took the Defendant back to building 2004 and handed him over to the Military Police, stating that he suspected the Defendant had killed Samir Mziou. A disagreement had already arisen between the Defendant and the victim on the first day of work, August 01st, 2024. The victim had complained to him that the Defendant could not sand properly and would not listen to him, the foreman.

The witness Eimen Toukabri was also interrogated by German detectives and stated that the victim Samir Mziou had told him he would be going to get some more bits. He then waited for the victim's return. At some point in time, he wondered where the victim was and tried to call him. However, Samir Mziou did not answer the call. Shortly thereafter, the witness Amir Toukabri drove to building 2004 with Mohamed Ezzraibi, and at 08:27 a.m., Amir Toukabri informed him that Samir would be unconscious. He then also went to Building 2004 and began resuscitation until his brother, the witness Amir Toukabri, arrived with a military woman who continued the resuscitation efforts. During the resuscitation efforts, he noticed that part of the victim's dentures was missing. He then waited in front of Building 2004. The Defendant was sitting there on a chair and was guarded by American Military Police. The witness stated that he had seen the Defendant take a can of energy drink from his backpack and drink from it. He also had seen the Defendant pour liquid from the can into his backpack.

During his interrogation by German detectives, the witness Mohamed Ezzraibi confirmed the statements of the witness Amir Toukabri and also made the following statement: When he entered the Building 2004, he noticed that the accused was holding a grey T-shirt in his hand.

The three witnesses, Amir Toukabri, Eimen Toukabri, and Mohamed Ezzraibi, all stated that they had not observed any other persons at or inside Building 2004 or on the way to or from Building 2004. All other workers had been on the construction site.

The walking distance from Building 2007 to Building 2004 took approximately 2 minutes 40 seconds, and the driving distance approximately 1 minute 20 seconds, as verified by Chief Inspector Mr. Müller of the Kaiserslautern Criminal Investigation Department. Furthermore, the crime scene was measured by the Rhineland-Palatinate State Office of Criminal Investigations and documented photographically.

Chief Inspector Mr. Müller examined the cell phone carried by the deceased and the missed call from Eimen Toukabri at 08:17 a.m. in the call log was recorded.

*[Coat of Arms]*    **Rhineland Palatinate**
PUBLIC PROSECUTOR'S OFFICE OF KAISERSLAUTERN

Amir Toukabri's cell phone was also viewed and the phone calls at 08:27 a.m. and 08:28 a.m. were recorded in the call log. The emergency call at 8:28:27 a.m. was recorded and documented.

The witness Karly R. Pfaff of the 2nd Military Police Company confirmed the statements of the witness Amir Toukabri and claimed that she was in the control room of the Provost Marshal's Office when a man she did not know ran up and said he would need emergency services because there was a medical emergency at the construction site. The unknown man then led her to a room at the very rear of Building 2004, where Samir Mziou, who later died, was lying. The witness Karly R. Pfaff then began resuscitation measures. After she was replaced, she asked the very agitated man (the witness Amir Toukabri) what had happened. The witness Toukabri reported to her his observations and his suspicions in accordance with his later statements to the German Detective Squad during formal interrogation.

b) The crime scene investigation was still conducted on August 03rd, 2024 by the forensic science unit of the Kaiserslautern Detective Squad, and the entire extended crime scene was documented by means of photographs. The deceased's helmet was found lying on the floor in the tool room. A bag containing tool accessories was documented in the hallway. The deceased's lower dentures were found lying on the floor in the hallway, to the left of the door frame to the tool room, and were confiscated.

On August 07th, 2024, Chief Inspector Mr. Müller inspected the entire fence system surrounding the construction site and documented it with photographs. No damage to the fence system was found. The fences were completely closed. The vegetation surrounding the fence system was also not visibly trampled down.

c) The Defendant, Dominic Jason Moore, was initially informed on his rights as a Defendant by Senior Airman Taylor Mustain, Senior Airman Tristan Mustain, and Army Staff Sergeant Ross, then temporarily arrested, searched, and taken into custody at 09:24 a.m. on August 03rd, 2024. According to the witnesses, the Defendant did not ask why he was being handcuffed. He was remarkably calm, as if nothing had happened. The witnesses also observed him doing a noticeable number of push-ups and stretching exercises in the detention cell. Army Staff Sergeant Ross stated that during the search he also confiscated the backpack carried by the Defendant and took photographs of all items in it, including the Defendant's passport, which is to be found attached to the request for mutual legal assistance. When doing so, de determined that the person arrested and suspected of the crime was the passport holder, the Defendant Dominic Jason Moore. The witness Ross found a grey T-shirt in the Defendant's backpack, secured it in an evidence bag and handed it over to Chief Inspector Ms. Huber of the German Detective Squad. The witnesses noted, in accordance with the statements of the

*[Coat of Arms]*   **Rhineland Palatinate**
PUBLIC PROSECUTOR'S OFFICE OF KAISERSLAUTERN

witness Eimen Toukabri, that the grey T-shirt was wet.

The Kaiserslautern Public Prosecutor's Office subsequently filed an application for an arrest warrant with the Kaiserslautern District Court. This application was refused. Following the appeal of the Kaiserslautern Public Prosecutor's Office, the Kaiserslautern Regional Court subsequently issued the attached arrest warrant dated August 20th, 2024. In the meantime, the Defendant absconded and, according to the information now obtained through the Kaiserslautern Resident Agency of the Department of the Army Criminal Investigation Division, is residing at 6810 Park Heights Avenue, Apartment 407, Baltimore, Maryland 21215. The Defendant served as a soldier in the U.S. Army from November 15th, 2016, to October 20th, 2021.

d) During the autopsy conducted by the forensic experts Dr. Ramsthaler and F. Behne of the Institute of Forensic Medicine in Homburg / Saar on August 04th, 2024, the following was found out: Both-sided hemorrhaging of the soft tissues of the neck, with the emphasis on the deeper layers of the neck muscles and directly at the larynx, a fresh abortion of the right superior horn of the larynx and hemorrhaging in the posticus muscle were also found. Moreover, there were massive Tardieu-type asphyxiation hemorrhages in the lungs and petechial hemorrhages of the eyelid conjunctiva. Furthermore, there were fresh skin hemorrhages on the left cheek and the right temporal region. There was no evidence of aggressive or defensive injuries. There was no indication of a natural cause of death.

According to the forensic pathologists, based on their findings during the autopsy, there is a strong suspicion of fatal neck compression by another hand. Given the lack of typical external skin lesions in the neck region, a direct manual attack by strangulation with the "bare hand" seems unlikely. However, a strangulation attack with indirect compression, for example, by placing a textile underneath, seems likely. A choking action or a combination of both mechanisms could also be considered, provided the choking instrument was applied broadly enough and the violence thus explicably neither left typical strangulation marks on the skin nor constrictions in the sense of a choking mark.

According to the forensic experts, the fresh skin hemorrhages found on the left cheek and right temple region can be attributed to a blow with the flat hand or fist.

e) On August 03rd, 2024, Detective Inspector Mr. Morsch took a saliva sample from the Defendant for comparison with DNA traces collected at the crime scene. In addition, forensic evidence was also collected from him in the form of abrasions.

The saliva was compared with DNA-containing traces which had been found on the dead body. Furthermore, the victim's DNA collected from the dead body was compared with traces recovered from the Defendant and the Defendant's seized gray T-shirt. The analysis of the traces and the comparison with the DNA collected from the Defendant and the victim was carried out by Dr. Michaela Groß, an

*[Coat of Arms]*   **Rhineland Palatinate**
PUBLIC PROSECUTOR'S OFFICE OF KAISERSLAUTERN

expert in forensic DNA analysis from the Rhineland-Palatinate State Office of Criminal Investigations..

The analysis of the mixed trace of the abrasion on the victim's right thumb resulted in a match in all 16 characteristic systems with the DNA profile of the Defendant. According to the expert Dr. Groß, this indicates with the highest probability that the trace on the victim's right thumb was caused by the Defendant. According to her findings, it is more than 30 billion times more likely that the constellation of characteristics found in the mixed trace originated from the victim and the Defendant than if it originated from the victim and an unknown person not related to the Defendant.

The DNA characteristics detected in the mixed trace on the right little finger of the Defendant and of the victim match in all 16 analyzed STR (Short Tandem Repeat) characteristic systems. This is a mixed profile that displays a constellation of characteristics that would result from the patterns of the Defendant and the victim. According to the experts' findings, it is more than 30 billion times more likely to be observed if the characteristics originate from the Defendant and the victim than if they originated from the Defendant and an unknown person unrelated to the victim.

Furthermore, the Defendant cannot be excluded as a partial contributor to the following mixed traces: the victim's jeans, the victim's T-shirt, the victim's hand rubs, and the victim's neck abrasions. On the other hand, the victim cannot be excluded as a partial contributor to the mixed traces on the Defendant's hand abrasions and his gray T-shirt.

### 3. Legal assessment

When it comes to the facts of the case, the Defendant is strongly suspected of having committed second-degree murder.

The relevant criminal provision which makes second-degree murder a punishable offense is as follows:

§ 212 of the German Criminal Code (second-degree murder)

(1) Anyone who kills a person without being a murderer shall be punished as a manslayer with a term of imprisonment of not less than five years.

(2) In particularly serious cases, a life-long term of imprisonment shall be imposed.

*[Coat of Arms]*   **Rhineland Palatinate**
PUBLIC PROSECUTOR'S OFFICE OF KAISERSLAUTERN

## 4. Statute of limitations

Statute of limitations has not yet occurred. According to German law, second-degree murder is subject to a statute of limitations of 20 years pursuant to § 78 (3) Number 2 of the German Criminal Code.

§ 78 of the German Criminal Code (period of limitation)

...

(3) To the extent that prosecution has expired by limitation, the statute of limitations shall be:

1. 30 years for offenses punishable with life-long imprisonment,

2. 20 years for offenses punishable with a maximum term of imprisonment of more than 10 years,

...

## 5. Measure requested

The investigations of the German authorities have now revealed that the male Defendant, Dominic Jason Moore, is residing in the United States of America at 6810 Park Heights Avenue, Apartment 407, Baltimore, Maryland 21215.

I politely request that the American citizen Dominic Jason Moore, born on December 22nd, 1995 in Virginia, currently presumably residing at 6810 Park Heights Avenue, Apartment 407, Baltimore, Maryland 21215, be extradited in order to prosecute the offense stated in the attached arrest warrant of the Kaiserslautern Regional Court dated August 20th, 2024, File Number 5 Qs 86/24, namely second-degree murder to the detriment of Samir Mziou. I also request that the person being pursued be taken into detention pending extradition and, upon extradition, to inform me on the period during which the person being pursued was held in detention as a result of the extradition request.

I already would like to state at this point that it is intended that the person being pursued will be picked up by German officials in the United States of America and transferred by plane to the Federal Republic of Germany at the expense of the German law enforcement authorities.

With reference to Article 14 of the Mutual Legal Assistance Treaty between the United States of America and Germany, I kindly request that you treat this request and its contents confidentially, as disclosure could jeopardize the success of the investigation procedure. Given the serious nature of the offence and the threat of punishment, there is reason to fear that the Defendant could again evade arrest and extradition by absconding.

MOORE - EXT request from Germany - 0072          1:25-mj-02312-JMC

*[Coat of Arms]*    **Rhineland Palatinate**
PUBLIC PROSECUTOR'S OFFICE OF KAISERSLAUTERN

For further queries, please contact the Public Prosecutor being in charge of the case, Ms. Angelika Rumpf, and her representative, Senior Public Prosecutor Mr. Stefan Orthen, of the Kaiserslautern Public Prosecutor's Office at telephone number 0049 (631) 3721-220 or -299 or by email at stakl@genstazw.jm.rlp.de.

I would like to thank you in advance for your efforts.

Faithfully Yours,

*[handwritten illegible signature)*

(Dr. Gehring)
Leading Senior Public Prosecutor

*[Round stamp: Public Prosecutor's Office of Kaiserslautern]*

10 / 10

In my function as a translator officially recognised and sworn-in by the Higher Regional Court in Hamm (Federal State of North Rhine Westphalia/Germany) I herewith confirm and certify the correctness and completeness of the preceding translation.

Minden (Germany), March 18th, 2025    Ellen Brunschön    ......E. Brunschön

MOORE - EXT papers from Germany - 0073    1:25-mj-02312-JMC

Beglaubigte Abschrift

Aktenzeichen:
**5 Qs 86/24**
1 AR-E 84/24 AG Kaiserslautern
6035 Js 13657/24 StA Kaiserslautern



# Landgericht
# Kaiserslautern

# Beschluss

In dem Strafverfahren gegen

**Dominic Jason Moore,**
geboren am 22.12.1995, Staatsangehörigkeit: amerikanisch, wohnhaft: Eisenbahnstraße 37,
67655 Kaiserslautern

wegen Totschlags
hier: Beschwerde

hat die 5. Strafkammer des Landgerichts Kaiserslautern durch die Vorsitzende Richterin am
Landgericht Thomas, die Richterin am Landgericht Schirra und die Richterin am Landgericht
Müller am 20.08.2024 beschlossen:

1.    Auf die Beschwerde der Staatsanwaltschaft Kaiserslautern gegen den Beschluss des
      Amtsgerichts Kaiserslautern vom 04.08.2024 wird dieser aufgehoben und gegen den Be-
      schuldigten Dominic Jason Moore die Untersuchungshaft angeordnet.

2.    Die Kosten des Beschwerdeverfahrens und seine insoweit entstandenen notwendigen
      Auslagen hat der Beschuldigte zu tragen.

# Gründe:

1. Nach den bisherigen Ermittlungen besteht gegen den Beschuldigten der dringende Tatverdacht
des Totschlags (§ 212 StGB).

Dem Beschuldigten wird nach dem von der Staatsanwaltschaft ermittelten Sachverhalt zur Last

5 Qs 86/24                                           - Seite 2 -

Sachverhalt:

Der Beschuldigte begab sich am 03.08.2024, gegen etwa 08.00 Uhr in das Gebäude 2004 auf
dem Gelände der AirBase Vogelweh, Haderwald, 67661 Kaiserslautern, wo er sich nach Anwei-
sung seines Arbeitgebers, des Zeugen Amir Toukabri, umziehen sollte. Im Gebäudeinneren traf er
seinen Arbeitskollegen Samir Mziou, welcher dort eine Kiste Akkuscharuber-Bits holen wollte. Im
weiteren ungeklärten Verlauf attackierte der Beschuldigte Samir Mziou, indem er gewaltsam
durch Drosseln oder Würgen solange auf dessen Hals einwirkte, bis dieser zu Boden ging. An-
schließend zog er ihn in einen ungenutzten Raum im hinteren Bereich des Gebäudes.

Als der Zeuge Amir Toukabri und der Zeuge Mohamed Ezzraibi etwa um 8.30 Uhr das Gebäude
betraten, um Samir Mziou zu suchen, kam ihnen der Beschuldigte entgegen. Der Zeuge Amir
Toukabri suchte dann alle Räumlichkeiten des Gebäudes 2004 ab und konnte Samir Mziou lie-
gend im hintersten Raum des Gebäudes auf der rechten Flurseite auffinden, wobei dessen Kopf
blau unterlaufen war. Er begann Samir Mziou zu reanimieren und verständigte den Notruf. Samir
Mziou vertarb jedoch gegen 09.08 Uhr an der Tatörtlichkeit, was der Beschuldigte zumindest billi-
gend in Kauf nahm.

Ein dringender Tatverdacht hinsichtlich dieses Tatvorwurfs ist nach dem bisherigen Ermittlungs-
ergebnis gegeben. Dieser ergibt sich im Wesentlichen aus den Aussagen der Zeugen Amir Tou-
kabri, Eimen Toukabri und Ezzraibi, dem Obduktionsbericht sowie den sonstigen Ermittlungser-
gebnissen.

Entsprechend dem Obduktionsbericht des Instituts für Rechtsmedizin Homburg/Saar vom
04.08.2024 (Bl. 18 d. A.) besteht ein dringender Verdacht dahingehend, dass die Todesursache
von Samir Mziou ein manueller Angriff auf dessen Hals (Drosseln – Würgen oder Würgen mit
Textil dazwischen) gewesen ist. An der Leiche von Samir Mziou waren nach erster vorläufiger
Sektionsdiagnose Einblutungen im Halsweichgewebe, ein frischer Abbruch des rechten Kehlkopf-
oberhornes sowie Einblutungen des sog. Posikus-Muskel, ferner klassische Erstickungsblutun-
gen sowie petechiale Einblutungen der Lidbindehäute erkennbar. Ein Hinweis auf eine natürliche
Todesursache war nicht feststellbar.

Weiter ergibt sich aus dem bisherigen Ermittlungsergebnis, dass diese Gewalteinwirkung auf Sa-
mir Mziou zwischen kurz nach 08.00 Uhr und 08.30 Uhr im Gebäude 2004 erfolgte und nur der
Beschuldigte zur Tatzeit zugegen war, sodass die Kammer mit einer hohen Wahrscheinlichkeit
davon ausgeht, dass der Beschuldigte den Tod von Samir Mziou gewaltsam verursacht hat.

MOORE - EXT request from Germany - 0075                    1:25-mj-02312-JMC
- Seite  3 -

Ausweislich der Aussage des Zeugen Amir Toukabri hätten sich Samir Mziou sowie der Beschul-
digte etwa zur gleichen Zeit, circa um 8.00 Uhr, in Richtung des Gebäudes 2004 begeben. Der
Beschuldigte habe sich umziehen sollen. Samir habe Werkzeug holen wollen. Nachdem Samir
20 bis 30 Minuten später nicht zurückgekehrt gewesen sei, habe er seinem Bruder, den Zeugen
Eimen Toukabri darum gebeten, Samir anzurufen. Diese Angabe wird bestätigt durch die Aussa-
ge des Zeugen Eimen Toukabri, sowie die Lichtbildaufnahme von dem Smartphone von Samir
Mziou (Bl. 117 d. A.), die einen verpassten Anruf des Zeugen Eimen Toukabri (dort geschrieben
*Aymen Toukabri*) um 08.17 Uhr zeigt.

Der Zeuge Amir Toukabri gab weiter an, er sei dann mit dem Zeugen Ezzraibi (ebenfalls dort täti-
ge Mitarbeiter der Firma Peter Gross) zum Gebäude 2004 gefahren, um Samir zu suchen. Vor
dem Gebäude habe der Wagen von Samir mit laufendem Motor und eingeschaltetem Licht ge-
standen. Im Gebäude sei ihm dann der Beschuldigte oberkörperfrei entgegengekommen. Diese
Angaben werden auch bestätigt durch die Aussage des Zeugen Ezzraibi. Dieser ergänzte außer-
dem, dass der Beschuldigte ein graues T-Shirt in der Hand getragen habe (Bl. 343 ff. d. A.).

Nach den weiteren Angaben des Zeugen Amir Toukabri fand dieser Samir Mziou dann in einem
ungenutzten Raum (hinterster Raum des Gebäudes auf der rechten Seite) liegend mit gestreck-
ten Armen. Auch insoweit gab der Zeuge Ezzraibi bestätigend an, dass er Amir habe schreien hö-
ren „Samir ist auf dem Boden." Er sei dann reingegangen und Amir sei ganz hinten im letzten
Zimmer rechts gewesen.

Die Kammer geht entsprechend dem jetzigen Ermittlungsstand davon aus, dass Samir Mziou
durch ein gewaltsames Einwirken des Beschuldigten zu Tode gekommen ist. Dass insoweit ein
Dritter als Täter in Frage kommt, hält die Kammer für fernliegend. Es gibt keinerlei Anhaltspunkte,
dass sich zum Todeszeitpunkt bzw. zum Zeitpunkt der tödlichen Gewalteinwirkung andere Per-
sonen im Gebäude 2004 aufgehalten haben als der Beschuldigte und Samir Mziou. So gab der
Zeuge Amir Toukabri an, dass sich die restlichen Mitarbeiter auf der Baustelle (Gebäude 2007)
befunden hätten. Der Zeuge Ezzraibi gab an, dass in Gebäude 2004 (bei ihrem Eintreffen) außer
ihnen niemand gewesen wäre. Der Zeuge Weber gab an, dass alle Mitarbeiter, die mit ihm (zu-
vor) zusammen Helme und Arbeitsweste in Gebäude 2004 geholt hätten, das Gebäude wieder
verlassen hätten. Im Gebäude sei dann niemand mehr gewesen. Dass sich eine dritte Person,
die nicht auf der Baustelle gearbeitet hat, Zutritt verschafft hat, ist darüber hinaus unwahrschein-
lich. Auf der Airbase erfolgen strenge Zugangskontrollen. Zudem ist das Gelände von einem Zaun
umgeben, der - entsprechend den Ermittlungen - keine Löcher oder Ähnliches aufwies, die auf ein

Darüber hinaus ist davon auszugehen, dass es bereits ein bzw. zwei Tage vor dem Tatgeschehen zu Spannungen zwischen Samir Mziou und dem Beschuldigten gekommen ist. So gab der Zeuge Amir Toukabri an, Samir (Mziou) und der Beschuldigte seien an dem ersten Arbeitstag des Beschuldigten, dem 01.08., ein bisschen aneinandergeraten. Samir sei verärgert gewesen, da der Beschuldigte nicht habe richtig schleifen können. Er habe das Schleifgerät schief gehalten und Samir habe es ihm weggenommen. Er (der Zeuge Toukabri) habe dann mit dem Beschuldigten gesprochen und ihm gesagt, dass Samir der Vorarbeiter sei und er auf ihn hören müsse. Zudem gab der Zeuge Derbas an, der Beschuldigte habe am Tag vor dem Tattag zu ihm, dem Zeugen Derbas gesagt, dass er nicht arbeiten wolle und dass er versuche sich in den Räumen zu verstecken. Samir (Mziou) habe dann gefragt, wo der Amerikaner sei, woraufhin dieser ihm gesagt habe, dass der Amerikaner nicht arbeite. Samir habe das dann dem Arbeitgeber gesagt, woraufhin dieser den Amerikaner aufgefordert habe zu arbeiten.

Hinzu kommt, dass der Zeuge Chtioui, der nur kurze Zeit bei dem Zeugen Amir Toukabri gearbeitet hat, ein aggressives Verhalten des Beschuldigten ihm gegenüber beschrieben hat. Der Beschuldigte habe ihn aufgefordert eine Arbeit zu machen, die nicht seine gewesen sei. Der Beschuldigte habe ihn dabei angeschrien und gegen die Wand geschubst.

Dieses geschilderte Verhalten des Beschuldigten zeigt jedenfalls, dass der Beschuldigte durchaus zu grundlos aggresivem Verhalten neigt. Die Spuren am Leichnam deuten - in dieses Bild passend - darauf hin, dass Samir Mziou vor der tödlichen Handlung ins Gesicht geschlagen wurde. Ausweislich des Obduktionsberichts vom 04.08.2024 waren frische Hauteinblutungen an der linken Wange und rechten Schläfenregion zu erkennen. Nach den Angaben der Rechtsmedizin Homburg vom 05.08.2024 können diese Verletzungen mit einem Schlag mit der flachen Hand oder Faust in Einklang gebracht werden. Hinzu kommt, dass ein Teil der Unterkieferprothese von Samir Mziou in der Nähe des Werkzeugraums gefunden wurde, der Leichnam selbst viel weiter hinten in dem Gebäude. Es ist dementsprechend naheliegend, dass es zunächst in der Nähe des Werkzeugraums zu einer körperlichen Auseinandersetzung in Form eines Schlags kam, der Beschuldigte Samir Mziou in der Folge erwürgte und ihn anschließend in den Raum zog, wo Samir Mziou von dem Zeugen Toukabri mit nach oben ausgestreckten Armen gefunden wurde.

Ein weiteres Indiz für die Täterschaft des Beschuldigten ist dessen Nachtatverhalten in Zusammenschau mit dem Umstand, dass Samir Mziou ausweislich des Obduktionsberichtes mit einem befindlichen Textil erwürgt worden sein könnte. Denn der Beschuldigte wurde ausweislich der Aussage des Zeugen Ezzraibi oberkörperfrei mit seinem T-Shirt...

MOORE - EXT request from Germany - 0077

5 Qs 86/24                              - Seite  5 -

der Beschuldigte nach der Festnahme den Inhalt seines Getränks in den Rucksack geleert habe. Diese Angabe wird auch bestätigt durch die Angaben im Ermittlungsbericht vom 03.08.2024 (Bl. 12 d. A.), dass man im unteren Bereich des Rucksacks des Beschuldigten ein feuchtes T-Shirt festgestellt habe. Die Kammer hält es demnach für naheliegend, dass der Beschuldigte so versuchte, mögliche Spuren auf dem T-Shirt zu verwischen.

Im Rahmen der Gesamtwürdigung aller bisher vorhanden Beweismittel sieht die Kammer den dringenden Tatverdacht als gegeben an. Dafür dass jemand anderes für den Tod von Samir Mziou verantwortlich sein könnte, gibt es hingegen keine Anhaltspunkte. Sämtliche Zeugen gaben sinngemäß an, mit Samir Mziou gut klar gekommen zu sein. Der Zeugen Amir und Eimen Toukabri beschrieben sogar ein freundschaftliches Verhältnis.

2. Es besteht der Haftgrund der Flucht (§ 112 Abs. 2 Nr. 1 StPO). Daneben besteht auch der Haftgrund der Schwerkriminalität (§ 112 Abs. 3 StPO). Der Beschuldigte ist US-amerikanischer Staatsangehöriger und wird eines Verbrechens verdächtigt. Nach der Tatbegehung ist er durch Amir Toukabri seiner Unterkunft verwiesen worden. Sein derzeitiger Aufenthaltsort ist nicht bekannt. Ermittlungen blieben bislang erfolglos. Es ist davon auszugehen, dass im Hinblick auf die zu erwartende Strafe ein so erheblicher Fluchtanreiz besteht, der erwarten lässt, dass der Beschuldigte sich dem Verfahren durch Flucht entzieht.

3. Die Anordnung der Untersuchungshaft steht zu der Bedeutung der Sache und der zu erwartenden Strafe oder Maßregel der Besserung und Sicherung nicht außer Verhältnis. Weniger einschneidende Maßnahmen (§§ 116, 116a StPO) begründen nicht die Erwartung, dass der Zweck der Untersuchungshaft auch durch sie erreicht werden kann.

4. Die Kostenentscheidung ergibt sich aus § 473 Abs. 2 StPO.

5 Qs 86/24

- Seite 6 -

Thomas

Vorsitzende Richterin
am Landgericht

Schirra

Richterin
am Landgericht

Müller

Richterin
am Landgericht

Beglaubigt:

(Müller), Justizhauptsekretärin
als Urkundsbeamtin der Geschäftsstelle



Durch maschinelle Bearbeitung beglaubigt – ohne Unterschrift gültig

MOORE - EXT request from Germany - 0079

## CERTIFIED TRANSLATION FROM GERMAN

Certified Copy

*[ Coat of Arms of Rhineland Palatinate ]*

Reference:
**5 Qs 86/24**
1 AR-E 84/24 District Court of Kaiserslautern
6035 Js 13657/24 Public Prosecutor's Office of Kaiserslautern

# Regional Court
# of Kaiserslautern

## Order

In the Criminal Proceedings against

**Dominic Jason Moore**,
born on December 22nd, 1995, citizenship: American resident: Eisenbahnstraße 37, 67655 Kaiserslautern

due to Homicide
here: Complaint

the 05th Criminal Chamber of the Regional Court of Kaiserslautern, through the Chief Judge at the Regional Court Ms. Thomas, the Judges Ms. Schirra and Ms. Müller at the Regional Court of Kaiserslautern, decided on August 20th, 2024:

1)     Following the complaint of the Public Prosecutor's Office of Kaiserslautern the order of the District Court of Kaiserslautern dated August 04th, 2024 is repealed and against the Defendant Dominic Jason Moore custody is ordered.

2)     The costs of the complaint proceedings and any necessary expenses incurred in this connection shall be borne by the Defendant.

## Reasons:

1. According to the investigations to date, there is strong suspicion of homicide against the Defendant (§§ 212 of the German Criminal Code (StGB)).

According to the facts investigated by the Public Prosecutor's Office, the Defendant is charged with having murdered a person in Kaiserslautern on August 03rd, 2024, without being a murderer.

MOORE - EXT request from Germany - 0080

1:25-mj-02312-JMC

5 Qs 86/24                                        - Page 2 -

Facts of the case:

On August 03rd, 2024, at around 8:00 a.m., the Defendant went to the building 2004 in the area of AirBase Vogelweh, Haderwald, 67661 Kaiserslautern, where he was sent to change his clothes according to the instructions of his employer, the witness Amir Toukbari. Inside the building he met his work colleague Samir Meziou, who wanted to get a box of cordless screwdriver bits there. In the further course of events, which remained unclear, the Defendant attacked Samir Mziou by violently choking or strangling his neck until he fell to the ground. He then dragged him into an unused room at the rear of the building.

When the witnesses Amir Toukbari and Mohamed Ezzraibi entered the building at about 08.30 a.m. to look for Samir Mziou, the Defendant came towards them. The witness Amir Toukbari then searched all the rooms of the building 2004 and was able to find Samir Mziou lying in the rear room of the building on the right side of the corridor, with his head coloured in blue. He began to resuscitate Samir Mziou and called the emergency service. However, Samir Mziou died at the scene of the crime at around 09:08 a.m., which the Defendant at least approved.

According to the results of the investigation so far, there is strong suspicion in respect of this criminal charge. This is essentially based on the testimonies of the witnesses Amir Toukbari, Eimen Toukbari and Ezzraibi, the autopsy report and the other investigation results.

According to the autopsy report of the Institute of Forensic Medicine Homburg/Saar dated August 04th, 2024 (Sheet 18 of the file), there is a strong suspicion that the cause of Samir Mziou's death was a manual attack on his neck (choking - strangulation or strangulation with textile in between). According to the first preliminary sectional diagnosis, the dead body of Samir Mziou showed haemorrhages in the soft tissue of the neck, a fresh fracture of the right upper horn of the larynx, bleeding in the so-called posicus muscle, classic asphyxiation bleedings and petechial bleedings in the conjunctiva of the eyelids: there was no indication of a natural cause of death.

Furthermore, the results of the investigation so far show that the violence against Samir Mziou occurred between shortly after 08:00 and 8:30 a.m. in building 2004 and that only the Defendant was present at the time of the crime, so that the Chamber assumes with a high degree of probability that the Defendant caused the death of Samir Mziou.

5 Qs 86/24                                    - Page 3 -

According to the testimony of the witness Amir Toukabri, Samir Mziou and the Defendant headed towards building 2004 at about the same time, around 08:00 a.m. The Defendant was supposed to change his clothes. Samir wanted to get tools. After Samir did not return 20 to 30 minutes later, he asked his brother, the witness Eimen Toukabri, to call Samir by phone. This piece of information is confirmed by the testimony of the witness Eimen Toukabri, as well as the photograph taken by Samir Mziou's smart phone (Sheet 117 of the file), which shows a missed call from the witness Eimen Toukabri (there written *"Aymen Toukabri"*) at 08:17 a.m..

The witness Amir Toukabri further stated that he then drove to building 2004 with the witness Ezzraibi (also working there as an employee of the company owned by Peter Gross) to look for Samir. Samir's car was parked in front of the building with the engine running and the lights on. In the building, the Defendant approached him naked from the waist up. This piece of information is also confirmed by the testimony of the witness Ezzraibi. The latter also added that the Defendant was carrying a grey T-shirt in his hand (Sheet 343 and following of the file).

According to further information provided by the witness Amir Toukabri, he then found Samir Mziou lying in an unused room (the backmost room of the building on the right side) with his arms outstretched. In this respect, the witness Ezzraibi also confirmed that he heard Amir shouting "Samir is lying on the floor". He then went in and Amir was at the very back in the last room on the right.

Based on the current state of the investigation, the Chamber assumes that Samir Mziou died as a result of violent actions by the Defendant. The Chamber considers it unlikely that a third party could be the perpetrator in this regard. There is no evidence whatsoever that at the time of the death or at the time of the fatal violence there were any other persons in the building 2004 other than the Defendant and Samir Mziou. The witness Amir Toukabri stated that the remaining employees were on the construction site (building 2007). The witness Ezzrabi stated that there was no one else in the building in 2004 (when they arrived). The witness Weber stated that all the employees, who had previously fetched helmets and work vests together with him in the building 2004, left the building again. There was no one left in the building. Furthermore, it is unlikely that a third party, who was not working on the construction site, gained access to the building. There are strict access controls at the airbase. Additionally, the area is surrounded by a fence which - according to the investigations - did not have any holes or similar that could have indicated to an intrusion by unknown persons.

Furthermore, it can be assumed that tensions had already arisen between Samir Mziou and the Defendant one or two days before the crime was committed. The witness Amir Toukabri stated that Samir (Mziou) and the Defendant had a bit of an argument on the Defendant's first day of work, which was August 02[st]. Samir was angry because the Defendant was not able to grind properly. He held the grinding machine in a slanted manner and Samir took it away from him. He (the witness Toukabri) then spoke to the Defendant and told him that Samir was the foreman and that he had to listen to him. In addition, the witness Derbas stated that the day before the crime, the Defendant had told him that he did not want to work and that he would try to hide in the rooms. Samir (Mziou) then asked where the American was, whereupon the witness Derbas told him that the American would not work. Samir then informed the employer accordingly, whereupon the employer asked the American to work.

In addition, the witness Chtioui, who only worked for the witness Amir Toukabri for a short time, described the Defendant's aggressive behaviour towards him. The Defendant asked him to do work that was not assigned to the witness Chtioui. At the same time, the Defendant shouted at him and pushed him against the wall.

However, this described behaviour of the Defendant's shows that he is inclined to aggressive behaviour for no reason. The traces on the dead body indicate – fitting in this picture - that Samir Mziou was hit in the face before the fatal act. According to the autopsy report dated August 04th, 2024, fresh haemorrhages were visible on the left cheek and right region of the temple. According to information from the Homburg forensic medicine department dated August 05th, 2024, these injuries can be aligned with a blow with the flat hand or fist. Additionally, a part of Samir Mziou's lower jaw denture was found near the tool room, but the dead body itself was found much more at the back of the building. It is therefore likely that initially a physical confrontation in the form of a blow occurred near the tool room, which then led to the Defendant's strangling of Samir Mziou and then dragging him into the room where Samir Mziou was found by the witness Toukabri with his arms outstretched upwards.

A further indication of the Defendant's guilt is his behaviour after the crime, in conjunction with the fact that, according to the autopsy report, Samir Mziou may have been strangled with a piece of textile that was found, since according to the testimony of the witness Ezzraibi, the Defendant was found naked from the waist up with his T-shirt in his hand. He stuffed this into his backpack. Later, the witness Eimen Toukabri could observe how the Defendant emptied the contents of his drink into his backpack

5 Qs 86/24                              - Page 5 -

after being arrested. This testimony has also been confirmed by the information in the investigation report dated August 03rd, 2024 (Sheet 12 of the file) that a damp T-shirt was found in the lower part of the Defendant's backpack. The Chamber therefore considers it likely that the Defendant in that way attempted to cover up possible traces on the T-shirt.

In the context of the overall assessment of all evidence available to date, the Chamber considers that there is strong suspicion of the Defendant having committed the crime. However, there is no evidence that anyone else could be responsible for Samir Mziou's death. All witnesses stated analogously, that they got along well with Samir Mziou. The witnesses Amir and Eimen Toukabri even described it as a friendly relationship.

2. The reason for detention due to escape does exist (§ 112 (2) No. 1 of the Code of Criminal Procedure (StPO)). In addition, there does also exist the reason for detention due to serious crime (§ 112 (3) of the Code of Criminal Procedure (StPO)). The Defendant is a US citizen and is suspected of a crime. After committing the crime, he was expelled from his accommodation by Amir Toukabri. His current whereabouts are unknown. The investigations so far have been unsuccessful. It must be assumed that, in view of the expected punishment, there is such a significant incentive to escape that it is expected that the Defendant will evade the proceedings by escape.

3. The order for pre-trial detention is not disproportionate to the seriousness of the crime and the expected punishment or measure for changing for the better and securing. Less drastic measures (§§ 116, 116a of the Code of Criminal Procedure (StPO)) do not justify the expectation that the purpose of pre-trial detention could also be achieved by them.

4. The decision on costs follows is based on § 473 (2) of the Code of Criminal Procedure (StPO).

5 Qs 86/24                                    - Page 6 -


Thomas (Ms.)                    Schirra (Ms.)                Müller (Ms.)
Chief Judge                     Judge                        Judge
at the Regional Court           at the Regional Court        at the Regional Court


Certified:

(Ms. Müller), First Judicial Secretary
as Authenticating Officer of the Court Registry

> **Round stamp:**
> *Regional Court of Kaiserslautern – 999*
> **[ Coat of Arms ]**


Certified by machine processing - valid without signature

---

In my function as a translator officially recognised and sworn-in by the Higher Regional Court in Hamm
(Federal State North Rhine Westphalia/Germany) I herewith confirm and certify the correctness and
completeness of the preceding translation.


Minden (Germany), August 29th, 2024                    E. Brunschön
                                                       Ellen Brunschön



MOORE - EXT request from Germany - 0085                1:25-mj-02312-JMC

Kriminalinspektion Kaiserslautern 3

Datum 04.08.2024
VN 651003/03082024/1848





Abbildung 1: Übersichtsaufnahme des Reisepasses des Herrn Moore

MOORE - EXT request from Germany - 0086

1:25-mj-02312-JMC

## CERTIFIED TRANSLATION FROM GERMAN

76

Criminal Investigation Department of Kaiserslautern 3

Date: August 04th, 2024
VN: 651003/03082024/1848

*[Image 1: Photograph of Mr. Moore's passport, which was issued in English]*

POLRP 2065 / 2016 Photograph/Sketch folder

Page 2 of 9

In my function as a translator officially recognised and sworn-in by the Higher Regional Court in Hamm (Federal State of North Rhine Westphalia/Germany) I herewith confirm and certify the correctness and completeness of the preceding translation.

Minden (Germany), March 18th, 2025



E. Brunschön
Ellen Brunschön

MOORE - EXT request from Germany - 0087



Embassy
of the Federal Republic of Germany
Washington

MOORE - EXT request from Germany - 0088

1:25-mj-02312-JMC

Please refer in reply to: RK 531.41 SE Moore

L/LEI

2025 JUL 22  P  4 04

DEPARTMENT OF STATE

*Note Verbale 90/2025*

The Embassy of the Federal Republic of Germany presents its compliments to the US Department of State and, referring to Art. 29 of the Extradition Treaty between the Federal Republic of Germany and the United States of America of 1978 in the version of the Second Supplementary Agreement to the Extradition Treaty of 2006, and its Note Verbale 56/2025 of May 28, 2025, has the honor to

forward enclosed additional documentation from the Public Prosecutor's Office in Kaiserslautern regarding the extradition of the U.S. citizen **Dominic Jason MOORE**, born on December 22, 1995 in Virginia, **SSN: 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**, currently residing at 6810 Park Heights Avenue, Apartment 407, Baltimore, Maryland 21215, to be prosecuted for the crimes cited in the arrest warrant of the Regional Court in Kaiserslautern/Germany, case number 5 Qs 86/24 dated August 20, 2024.

The personal data transmitted may be used solely for the purpose for which they were transmitted. The data may not be forwarded to other States or to international or supranational organizations without prior approval from the Government of the Federal Republic of Germany.

The evidence and information transmitted from Germany may be used for any investigative and trial purposes, including with regard to third persons, provided that it may not be introduced:

        a.  in any trial for purposes of seeking to convict any person of an offence for which the death penalty could be imposed; and

        b.  in proceedings before extraordinary courts;

absent prior consent from the Federal Republic of Germany.

- 2 -

A copy of this Note Verbale and copies of the relevant judicial documents are included for the US Department of Justice.

The Embassy of the Federal Republic of Germany avails itself of this opportunity to renew to the US Department of State the assurances of its highest consideration.

Washington, D.C., July 18, 2025



U.S. Department of State
Office of Law Enforcement
and Intelligence (L/LEI)
2201 C-Street, N.W.
Washington, D.C. 20520

| **Polizeipräsidium Westpfalz** | **Datum** | 29.04.2025 |
|---|---|---|
| Kriminalinspektion Kaiserslautern 1 | **VN** | 651003/03082024/1848 |
| Kommissariat 11 | **Sachbearbeiter/-in** | Morsch, Niklas, KK |
| Logenstraße 5 | **Telefon** | +49 631 369-13801 |
| 67655 Kaiserslautern | **Telefax** | +49 6131 4868-8001 |

## Dienstliche Stellungnahme zur Identität des Beschuldigten

| In der Sache: | **§ 212 Totschlag,** |
|---|---|
| | **Moore Dominic, geb. 22.12.1995** |
| Aktenzeichen Staatsanwaltschaft: | **6035 Js 13657/24,** |
| | **Staatsanwaltschaft Kaiserslautern** |
| Vorgangsnummer: | **651003/03082024/1848** |

**Erkennungsdienstliche Behandlung**

Der Beschuldigt wurde am Tatort durch die Militärpolizei festgenommen und an die zuständige Kriminalpolizei der Kriminaldirektion Kaiserslautern übergeben. Die erkennungsdienstliche Behandlung wurde durch Kriminalkommissar Niklas Morsch in den Räumlichkeiten der Kriminaldirektion Kaiserslautern am 03.08.2024 durchgeführt. Dabei wurden Lichtbilder gefertigt, Fingerabdrücke genommen und eine DNA-Probe entnommen. Der amerikanische Reisepass mit der Nummer 535472942 wurde als Ausweisdokument eingescannt und mit der erkennungsdienstlich behandelten Person abgeglichen. Es konnte zweifelsfrei festgestellt werden, dass es sich bei der erkennungsdienstlich behandelten Person um die Person auf dem Reisepass handelt. Bei der Person auf dem Reisepass handelt es sich zweifelsfrei um Herr

Dominic Jason **Moore**
22.12.1995 in Virginia, Vereinigte Staaten / USA
6810 Park Heights Avenue, Apartment 407, Baltimore, Maryland 21215.

**Kaiserslautern, 01.05.2025**

**Niklas Morsch**
*Kriminalkommissar*



Kriminalinspektion Kaiserslautern 1

Datum    29.04.2025
VN       651003/03082024/1848

## Bildausschnitt Polizeiliches Informationssystem

| | | | |
|---|---|---|---|
| Name | Moore | Vorname | Dominic Jason |
| Geburtsdatum / Prüfziffer | 22.12.1995 | 1 | Hinweise | |
| Fahndungen | Ja | nicht identisch mit | |
| Satz-ID | P242180077078 | Stichwort | |

**Bildgruppe**
**Bertillon**                                                          **Ganzkörper**

Profil rechts            Frontal              Profil links

Halbprofil rechts                Halbprofil links

Ausweise



MOORE - EXT request from Germany - 0092          1:25-mj-02312-JMC

Kriminalinspektion Kaiserslautern 1          Datum    29.04.2025
                                             VN       651003/03082024/1848

## Einzelbilder

### Profil rechts



Angaben aus ED-Maßnahme

| | |
|---|---|
| Name | Moore |
| Vorname | Dominic Jason |
| Geb.-Datum | 22.12.1995 |
| Datum der ED-Maßnahme | 03.08.2024 |

Verkleinern    Schließen

### Frontal



Angaben aus ED-Maßnahme

| | |
|---|---|
| Name | Moore |
| Vorname | Dominic Jason |
| Geb.-Datum | 22.12.1995 |
| Datum der ED-Maßnahme | 03.08.2024 |

Verkleinern    Schließen



Kriminalinspektion Kaiserslautern 1

Datum   29.04.2025
VN      651003/03082024/1848

## Profil links



Angaben aus ED-Maßnahme

| | |
|---|---|
| Name | Moore |
| Vorname | Dominic Jason |
| Geb.-Datum | 22.12.1995 |
| Datum der ED-Maßnahme | 03.08.2024 |

Verkleinern | Schließen

## Halbprofil rechts



Angaben aus ED-Maßnahme

| | |
|---|---|
| Name | Moore |
| Vorname | Dominic Jason |
| Geb.-Datum | 22.12.1995 |
| Datum der ED-Maßnahme | 03.08.2024 |

Verkleinern | Schließen



MOORE - EXT request from Germany - 0094          1:25-mj-02312-JMC

Kriminalinspektion Kaiserslautern 1          Datum    29.04.2025
                                             VN       651003/03082024/1848

## Halbprofil links



Angaben aus ED-Maßnahme

| | |
|---|---|
| Name | Moore |
| Vorname | Dominic Jason |
| Geb.-Datum | 22.12.1995 |
| Datum der ED-Maßnahme | 03.08.2024 |

**Verkleinern**    **Schließen**

## Vorgelegter Reisepass



Angaben aus ED-Maßnahme

| | |
|---|---|
| Name | Moore |
| Vorname | Dominic Jason |
| Geb.-Datum | 22.12.1995 |
| Datum der ED-Maßnahme | 03.08.2024 |

**Verkleinern**    **Schließen**



**Kaiserslautern, 01.05.2025**

**Niklas Morsch**
*Kriminalkommissar*

## Certified translation from German to English

| | | |
|---|---|---|
| **West Palatinate Police Headquarters** | **Date:** | May 01st, 2025 |
| Criminal Investigation Department Kaiserslautern 3 | **VN:** | 651003/03082024/1848 |
| Commissariat 31 - 24-hour Criminal Service | **Case worker:** | Detective Superintendent Mr. Morsch, N. |
| Logenstraße 5 | **Telephone:** | +49 631 369-13312 |
| 67655 Kaiserslautern | **Telefax:** | +49 6131 4868-8013 |

## Official statement on the identity of the Defendant

In the case:                                **§ 212 Second-degree murder**
                                            **Moore, Dominic, born on December 22nd, 1995**

File number of the Public Prosecutor's Office:    **6035 Js 13657/24,**
                                            **Public Prosecutors Office of Kaiserslautern**

Case number:                                **651003/03082024/1848**

**Identification check**

The Defendant was arrested at the scene of the crime by the Military Police and handed over to the responsible Criminal Investigation Department of the Kaiserslautern Criminal Directorate. The identification check was carried out by Detective Superintendent Mr. Niklas Morsch in the premises of the Kaiserslautern Criminal Investigation Department on August 03rd, 2024. Photographs and fingerprints were taken and a DNA sample was taken too. The American passport with the number 535472942 was scanned as an identification document and compared with the person being officially identified. It was detected beyond doubt that the person being identified was the person on the passport. The identity was also confirmed by the Defendant himself. Therefore, the person on the passport was undoubtedly Mr.

<div align="center">

Dominic Jason **Moore**
December 22nd, 1995 in Virginia, United States / USA
6810 Park Heights Avenue, Apartment 407, Baltimore, Maryland 21215.

</div>

**Kaiserslautern, May 01st, 2025**

**Mr. Niklas Morsch**
*Detective Superintendent*
*[handwritten illegible signature]*

Criminal Investigation Department Kaiserslautern 3

**Date:** May 01st, 2025
**Case number:** 651003/03082024/1848

## Image section of the  Police Information System

| | | | |
|---|---|---|---|
| **Name:** | Moore | **First names:** | Dominic Jason |
| **Date of birth / Verification code:** | December 22nd, 1995 \ 1 | **Hints:** | |
| **Searches:** | Yes | **Not identical with:** | |
| **Set-ID:** | P242180077078 | **Keyword:** | |

**Image group
Bertillon**

| Profile Right | Frontal | Profile left | Whole body |
|---|---|---|---|
| *[Image]* | *[Image]* | *[Image]* | *[Image]* |

| Semi-profile right | Semi-profile left | | |
|---|---|---|---|
| *[Image]* | *[Image]* | | |

**ID-documents**

*[Image of the ID-card Dominic Jason Moore]*

MOORE - EXT request from Germany - 0097                1:25-mj-02312-JMC

Criminal Investigation Department Kaiserslautern 3          **Date:**        May 01st, 2025
                                                            **Case number:**  651003/03082024/1848

## Individual images

### Information from the Identification check

Name:                               Moore

First names:                        Dominic Jason

Date of birth:                      December 22nd, 1995

Date of the identification check:   August 03rd, 2024

Minimizing           Closing

### Profile right
*[Image]*

### Information from the identification check

Name:                               Moore

First names:                        Dominic Jason

Date of birth:                      December 22nd, 1995

Date of the identification check:   August 03rd, 2024

Minimising           Closing

### Profile frontal
*[Image]*

Criminal Investigation Department Kaiserslautern 3

**Date:**         May 01st, 2025
**Case number:**   651003/03082024/1848

---

**Information from the identification check**

Name:                               Moore

First names:                        Dominic Jason

Date of birth:                      December 22nd, 1995

Date of the identification check:   August 03rd, 2024

| Minimizing | | Closing |

**Profile left**
*[Image]*

---

**Information from the identification check**

Name:                               Moore

First names:                        Dominic Jason

Date of birth:                      December 22nd, 1995

Date of the identification check:   August 03rd, 2024

| Minimising | | Closing |

**Semi-profile right**
*[Image]*

---

Criminal Investigation Department Kaiserslautern 3

**Date:** May 01st, 2025
**Case number:** 651003/03082024/1848

---

**Information from the identification check**

Name:                 Moore

First names:            Dominic Jason

Date of birth:          December 22nd, 1995

Date of the identification check:    August 03rd, 2024

| Minimizing | | Closing |
| --- | --- | --- |

## Semi-profile left
*[Image]*

---

**Information from the identification check**

Name:                 Moore

First names:            Dominic Jason

Date of birth:          December 22nd, 1995

Date of the identification check:    August 03rd, 2024

| Minimising | | Closing |
| --- | --- | --- |

**Passport presented**
*[Image of the passport of Mr. Moore]*

**Kaiserslautern, May 01st, 2025**

**Mr. Niklas Morsch**
*Detective Superintendent*
*[handwritten illegible signature]*

---

In my function as a translator officially recognised and sworn-in by the Higher Regional Court in Hamm (Federal State North Rhine Westphalia/Germany) I herewith confirm and certify the correctness and completeness of the preceding translation.

Minden (Germany), May 06th, 2025        Ellen Brunschön

*[Stamp: Ermächtigte Übersetzerin vom OLG Hamm — Ellen Brunschön, Widukindstr. 7, 32429 Minden — Land NRW]*

MOORE - EXT request from Germany - 0100    1:25-mj-02312-JMC

## SWORN STATEMENT

For use of this form, see AR 190-45; the proponent agency is PMG.

### PRIVACY ACT STATEMENT

| | |
|---|---|
| AUTHORITY: | Title 10, USC Section 301; Title 5, USC Section 2951; E.O. 9397 Social Security Number (SSN). |
| PRINCIPAL PURPOSE: | To document potential criminal activity involving the U.S. Army, and to allow Army officials to maintain discipline, law and order through investigation of complaints and incidents. |
| ROUTINE USES: | Information provided may be further disclosed to federal, state, local, and foreign government law enforcement agencies, prosecutors, courts, child protective services, victims, witnesses, the Department of Veterans Affairs, and the Office of Personnel Management. Information provided may be used for determinations regarding judicial or non-judicial punishment, other administrative disciplinary actions, security clearances, recruitment, retention, placement, and other personnel actions. |
| DISCLOSURE: | Disclosure of your SSN and other information is voluntary. |

| 1. LOCATION | 2. DATE (YYYYMMDD) | 3. TIME | 4. FILE NUMBER |
|---|---|---|---|
| KMC LED | 20240803 | 1553 | |

| 5. LAST NAME, FIRST NAME, MIDDLE NAME | 6. SSN | 7. GRADE/STATUS |
|---|---|---|
| ROSS, CHANCE, EDWARD | 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 | E-6/RA |

| 8. ORGANIZATION OR ADDRESS |
|---|
| 92nd Military Police Company (WE2QAA) |

9. I, **Chance E. Ross**, WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:

THIS STATEMENT IS INTENDED TO CLARIFY AND/OR ELABORATE ON CERTAIN ASPECTS OF THIS CASE THAT ARE NOT COVERED ELSEWHERE BY OFFICIAL STATEMENTS AND/OR DOCUMENTS.

On 3 August 2024, at approximately 0830 hours, myself and PV2 Hahn, while operating as Solid 8, responded to a report of an unresponsive male with CPR in progress at Building 2004 on Vogelweh Air Base. Upon arrival, I assigned PV2 Hahn to establish a crime scene log and keep a record of those entering and exiting. I then went inside and saw Fire and EMS providing medical aid to the male with an automated CPR device. I spoke with Metro 10 and informed him that I had placed PV2 Hahn at the entrance and that I was going to take PFC Pfaff back to the PMO. PFC Pfaff was emotionally distraught because she was the first on scene and began conducting CPR to the victim. I escorted her back to the PMO and then returned to the scene. I spoke with Metro 10 and he confirmed that the victim, now identified as Mr. Samir Mzlou, was dead on arrival. I confirmed with him that he wanted us to apprehend the individual they suspected of killing Mr. Mzlou and he said yes. I then went outside of Building 2004 and made contact with the subject, Mr. Dominic Moore, who was sitting outside with his black backpack at his feet. I ordered Mr. Moore to stand up, face away from me, and place his hands behind his back. I informed him that he was being detained and applied hand restraints. I checked the hand restraints for tightness, and double-locked the restraints. I then read Mr. Moore his legal rights from an on scene rights advisal card, which he indicated that he fully understood. I then searched Mr. Moore and removed his belt and boots. When I tried to allow Mr. Moore to put his boots back on he stated that he did not want them. I handed him over to Metro 6, who transported him to the PMO. I took the boots, belt, and backpack with me for safekeeping and met them at the PMO. I confirmed with Metro 10 over the radio to place Mr. Moore in the Detention Cell. When Metro 6 arrived at the PMO, I took control of Mr. Moore and escorted him to the Detention Cell. Mr. Moore stated that he wished for his pants to be removed and that he had shorts on underneath. In an effort to preserve any evidence that may have been on his pants I removed them from Mr. Moore. Mr. Moore asked to go to the latrine, so I escorted him there. I removed his restraints in the latrine and he urinated in the urinal. After he was finished, I ordered him to place his hands back on his head and take a step backwards. I reapplied his hand restraints and escorted him back to the detention cell. (He has utilized the latrine three times so far while in custody, each time the exact same sequence of events occurred without incident.) Mr. Moore was also provided water. I then began processing the property he had on his person at the time of apprehension. I took photos of every item that was in his bag and returned all items to the bag, except his cell phone, wallet, GA Driver's License, and Passport. I sealed his belt, boots, and pants in an evidence bag and marked them with my initials, the date, and the time. I briefed Criminal Polizei when they arrived about his property and provided them with my information. I placed the items I marked as evidence in Evidence Lockers #1 and #2. I placed his items and identification for safekeeping in Locker #3. After escorting Mr. Moore to the latrine one more time, Criminal Polizei requested he be placed in the interview room. They spoke with him and asked him questions. They then requested his belongings be brought in and requested control of them. I signed his safekeeping property over to KK'in Weiland, she requested that we hold the evidence until later. They then went through Mr. Moore's devices in his presence. She then released the property to Mr. Moore and informed us that he did not need to go back in the cell for now. She requested I remove a grey t-shirt from Mr. Moore's backpack and place it into evidence. I placed the shirt in an evidence bag and put it in Locker #2. She stated that they were going to go back to the crime scene and confer with their colleagues. She requested we hold Mr. Moore here until the judge and come and seize his property. I transferred the evidence in Lockers #1 and #2 to the Desk Sergeant for safekeeping until Criminal Polizei return. Mr. Moore is in apparent good health at the time of this statement.///END OF STATEMENT///

CHANCE E. ROSS
SSG, USA
Military Police

| 10. EXHIBIT | 11. INITIALS OF PERSON MAKING STATEMENT | Page 1 of 1 |
|---|---|---|
| | CER | |

ADDITIONAL PAGES MUST CONTAIN THE HEADING "STATEMENT OF _____ TAKEN AT _____ DATED _____

THE BOTTOM OF EACH ADDITIONAL PAGE MUST BEAR THE INITIALS OF THE PERSON MAKING THE STATEMENT, AND PAGE NUMBER MUST BE INDICATED.

DA FORM 2823, NOV 2006    PREVIOUS EDITIONS ARE OBSOLETE.    APD AEM v1.04ES

| | | MPR/CID SEQUENCE NUMBER |
|---|---|---|
| **EVIDENCE/PROPERTY CUSTODY DOCUMENT** For use of this form see AR 195-5; the proponent agency is CID. | | **CRD REPORT/CID ROI NUMBER** |

| RECEIVING ACTIVITY Office of the Provost Marshal | LOCATION USAG Rhineland-Pfalz, DE |
|---|---|
| NAME, GRADE AND TITLE OF PERSON FROM WHOM RECEIVED ☑ OWNER  DOMINIC. J. MOORE  ☐ OTHER: | ADDRESS (Include Zip Code) 843 Hase Rd Unit 3275 Ft Stewart, GA 31315-7713 |
| LOCATION FROM WHERE OBTAINED At the feet of Moore, Dominic outside of the Crime Scene at Building 2004 | REASON OBTAINED Safe Keeping / TIME/DATE OBTAINED 0908  20240803 |

| ITEM NO. | QUANTITY | DESCRIPTION OF ARTICLES (Include model, serial number, condition and unusual marks or scratches) |
|---|---|---|
| 1 | 1 | GA State Driver's License, Assigned to "Dominic Jason Moore", "DOB 12/22/1995", bearing DL NO. "061578551". |
| 2 | 1 | United States Passport, Assigned to "Dominic Jason Moore", bearing Passport No. 535472942. |
| 3 | 1 | iPhone, Damaged in Condition, Blue and Silver in Color. |
| 4 | 1 | Backpack, R. Leone Brand, Black in Color, Damaged in Condition, Capacity: 80L, filled with Misc. Items belonging to Moore. |
| 5 | 1 | Wallet, Silent Pocket Brand, Blue in Color, Used in Condition, containing Wilke Key "400007" and Items 6-10. |
| 6 | 1 | Debit Card, Capital One, 5108 0502 8737 8082, belonging to Moore. |
| 7 | 1 | Debit Card, Synovus, 4060 4907 1134 5726, belonging to Moore. |
| 8 | 1 | Debit Card, US Bank, 4912 8800 0546 6663, belonging to Moore. |
| 9 | 1 | Credit Card, CreditOne Bank, 4707 9305 4962 6303, belonging to Moore. |
| 10 | 1 | €66,23, (1) €50 Bill, (1) €10 Bill, (1) €5 Bill, (1) €0,50 Coin, (2) €0,20 Coins, (2) €0,10 Coins, (1) €0,05 Coin, (2) €0,02 Coins, and (4) €0,01 Coins. |

| | | CHAIN OF CUSTODY | | |
|---|---|---|---|---|
| ITEM NO. | DATE | RELEASED BY | RECEIVED BY | PURPOSE OF CHANGE OF CUSTODY |
| 1-4 | 20240803 | NAME, GRADE OR TITLE Moore, Dominic — SIGNATURE | NAME, GRADE OR TITLE SSG Chance E. Ross; MP — SIGNATURE | Safe Keeping |
| 1-4 | 20240803 | NAME, GRADE OR TITLE SSG Chance E. Ross; MP — SIGNATURE | NAME, GRADE OR TITLE Weinland kk'in — SIGNATURE | TRANSFER TO HOST NATION POLICE |
| | | NAME, GRADE OR TITLE — SIGNATURE | NAME, GRADE OR TITLE — SIGNATURE | |
| | | NAME, GRADE OR TITLE — SIGNATURE | NAME, GRADE OR TITLE — SIGNATURE | |
| | | NAME, GRADE OR TITLE — SIGNATURE | NAME, GRADE OR TITLE — SIGNATURE | |

DA FORM 4137, JUL 2023    PREVIOUS EDITIONS ARE OBSOLETE.    APD AEM v1.00    PAGE 1 OF 2

LOCATION: _____    DOCUMENT NUMBER: _____